FILED*09 NOV 25 13:39USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE LEARNING INTERNET,
d/b/a/ Learning.com

              Plaintiff,

          v.

LEARN.COM, INC.,

              Defendant.

CV 07-227-AC
FINDINGS AND RECOMMENDATION

ACOSTA, Magistrate Judge:

*Introduction*

The Learning Internet ("TLI"), filed a First Amended Complaint against Learn.com, Inc. ("LCI"), seeking a declaratory judgment of no trademark infringement and no unfair competition pursuant to 28 U.S.C. § 2201 of the Federal Declaratory Judgment Act. Additionally, pursuant to 15 U.S.C. §§ 1064(3) and 1119 of the Lanham Act, TLI requests that the court cancel two of LCI's

Page 1 - Findings and Recommendation                  [LB]

federal registrations because of fraud on the Patent and Trademark Office ("PTO"). Finally, TLI seeks damages, including attorney's fees, caused by LCI's allegedly fraudulent registrations.

In response, LCI filed an Answer and Counterclaims to the First Amended Complaint asserting counterclaims for trademark infringement and unfair competition, under both federal and state law; unlawful business and trade practices, under state law; and alleging that TLI committed fraud on the PTO in its trademark applications. LCI requests both declaratory and monetary relief, including attorney's fees.

*Pending Motions*

Pending are TLI's Motion for Partial Summary Judgment on Fraud Claims and Counterclaims; TLI's Motion for Partial Summary Judgment on Trademark Infringement Related Claims; and the parties' cross-motions for partial summary judgment on the issue of whether LCI's marks are "merely descriptive." Oral argument was heard and, for the reasons set forth below, TLI's motion on the fraud claims should be granted, in part, and denied, in part. Specifically, TLI's request for judgment against LCI's Counterclaim V should be granted; and, TLI's request for judgment against LCI on Count 1 of TLI's Second Claim for Relief should be denied. TLI's motion on the trademark infringement claims should be granted. Specifically, TLI's request for judgment against LCI on Count 1 of TLI's First Claim for Relief should be granted; and TLI's request for judgment against LCI's Counterclaims I, II, III, IV and VI should be granted. Finally, the parties' cross-motions for partial summary judgment on the issue of whether LCI's marks are merely descriptive should be denied.

*Factual Background*

TLI was founded in 1999, and operates a Website, *learning.com*,[1] on which it sells technology "to teach core curriculum to elementary and secondary school students." (William J. Kelly Decl. – Trademark Claims – ¶¶ 7, 16, Nov. 14, 2008.) Currently, 99% of TLI's student interaction is through EasyTeach, a program that "engages students by addressing multiple learning styles . . . to teach software and hardware technology literacy while reinforcing learning in other core subject areas." (Kelly Decl. – Trademark Claims – ¶¶ 7-8.) TLI derives over 99.9% of its gross revenue from sales to K-12 entities. (Kelly Decl. – Trademark Claims – ¶ 5, Ex. 1.) On TLI's website, the company describes its business as:

> [T]he premier provider of Web-delivered curriculum and assessment partners with schools across the United States to improve student learning outcomes. Our solutions transform learning experiences through our understanding of the art and science of Web-based teaching and learning.

The Learning Internet Home Page, http://www.learning.com (last visited March 25, 2009). TLI exhibits at trade shows that focus exclusively on K-12 education. (James A. Kuhr Decl. – Trademark Claims – ¶¶ 6-7, Nov. 13, 2008.) It does not exhibit at trade shows that focus on corporate training because it "[does] not sell into that market and [has] no intention of doing so in the future." (Kelly Decl. – Trademark Claims – ¶ 15.)

LCI was created in early 1999. (Jim Riley Decl. – Merely Descriptive – ¶ 7, Nov. 13, 2008.) It operates a website, *learn.com*, on which it uses three service marks registered by the PTO to market its goods and services. LCI claims that through its products it:

---

[1] To promote clarity in this decision, the parties' websites are italicized, e.g., "*learn.com*", and the parties' marks are capitalized, e.g., "LEARN.COM".

> [H]elps people become more productive. Businesses can use *learn.com* to develop their employees, train their partners, or inform their customers. [LCI] technology allows training departments to quickly and easily meet complex compliance, certification, and training requirements. HR departments can automate all of their talent management functions with one integrated platform.

Learn.com, Inc. Home Page, http://learn.com/learncenter (last visited March 25, 2009). LCI claims to be "[t]he premier destination for e-learning . . . . [LCI] has the e-learning solutions your corporation, academic institution or government agency needs to compete. . . ." (Steven E. Klein Decl. – Fraud Claims – Ex. 1 at 120, Nov. 10, 2008.) LCI's target purchasers are human resource managers and corporate training department officials. (James B. Riley Dep. 93:12-23, Jan. 30, 2008.)

The *learn.com* website was registered on June 9, 1994, by Alan Whitman. (Riley Dep. 368:21-24) Whitman used the *learn.com* website to post an advertisement for his desktop publishing consulting business. (Riley Dep. 56:4-57:1, 74:13-75:5.) A July 10, 1997, screen shot of *learn.com* shows that Whitman used the website to provide "consulting[,] training[,] production[, and] presentation services for business, corporate and educational communication." (Klein Decl. – Fraud Claims – Ex. 1 at 45.) Under Whitman, *learn.com* specialized in "presentation design[,] training design[, ] media production and integration[,] project management[,] needs assessment[,] program evaluation[, and] systems integration." (Klein Decl. – Fraud Claims – Ex. 1 at 45.)

On January 15, 1999, Whitman sold the domain name *learn.com* to The Learning Revolution, Inc., a company co-owned by Jim Riley, founder and CEO of LCI. (Riley Dep. 54:5-58:8, 165:15-168:5; Klein Decl. – Fraud Claims – Ex. 1 at 42-44.) Riley was interested only in the domain name itself, not in Whitman's business or customers. (Riley Dep. 57:24-58:8, 76:21-25.) Shortly thereafter, Riley began using the mark LEARN.COM to sell memory-enhancement courses on tape

Page 4 - Findings and Recommendation                                    [LB]

and CD. (Klein Decl. – Fraud Claims – Ex. 1 at 130-33.) On February 10, 1999, Riley incorporated LCI and began using the LEARN.COM mark in connection with the Internet website *learn.com*. (Klein Decl. – Fraud Claims – Ex.3.)  Through the site *learn.com*, and under the trademark LEARN.COM, LCI began selling products and services that allowed corporations, schools, and government agencies to give educational materials to their employees and/or students over the Internet. (Riley Decl. – Merely Descriptive – ¶ 7.)

On February 22, 1999, LCI filed an application, Serial No. 75/644,957 ("'957 application"), with the PTO to register the service mark LEARN.COM. (Klein Decl. – Fraud Claims – Ex. 1 at 130-41.) The '957 application stated a first-use date of the mark LEARN.COM in commerce of October 1, 1998. (Klein Decl. – Fraud Claims – Ex. 1 at 132.) LCI submitted the application to register the mark LEARN.COM in connection with:  "Advertising and Business, namely, computerized online search and ordering services featuring the wholesale and retail distribution of educational services in the form of books, multimedia products, audio cassettes, video cassettes, and computer software in the form of compact disks, floppy disks, CD ROMs and direct digital transmission" and in connection with "educational material, namely computerized online ordering services featuring the wholesale and retail sale of educational services in the form of books, multimedia products, audio cassettes, video cassettes, and computer software in the form of compact disks, floppy disks, CD ROMs and direct digital transmission." (Klein Decl. – Fraud Claims – Ex. 1 at 136.)

On September 17, 1999, LCI filed another application, Serial No. 75/843,269 ("'269 application"), with the PTO in connection with: "Miscellaneous Services in the form of computerized online ordering services featuring the sale of educational services in the form of books,

multimedia products, audio cassettes, video cassettes, and computer software in the form of compact disks, floppy disks, CD ROMs and direct digital transmission." (Klein Decl. – Fraud Claims – Ex.1 at 92-95.) The '269 application stated a first-use date of the mark LEARN.COM of June 9, 1994. (Klein Decl. – Fraud Claims – Ex.1 at 93.) On July 10, 2000, the PTO issued a nonfinal Office Action that refused LCI's '269 application because "the proposed mark merely describes the applicant's services." (Klein Decl. – Fraud Claims – Ex. 1 at 100.) On November 21, 2000, LCI responded to the PTO by filing an amended '269 application that asserted acquired distinctiveness as the basis for registration. (Klein Decl. – Fraud Claims – Ex. 1 at 115.) The PTO then granted registration of the LEARN.COM mark on March 25, 2003, for use in connection with: "educational services, conducting on-line courses of instruction in the field of learning solutions . . . for businesses, educational institutions and individuals." (Lane M. Chitwood Decl. – Merely Descriptive – Ex. 12, Nov. 14, 2008.)

In May 2000, LCI acquired the mark LEARN2.COM from Panmedia Corporation. Under the LEARN2.COM mark, Panmedia offered "how to" guides and adult training courses in 1999 and 2000. (Klein Decl. – Merely Descriptive – Ex. 10 at 1, 4, 6, Dec. 5, 2008.) Its course offerings included titles such as "Learn2 Make Incense," "Learn2 Repair Scratches and Rust Spots," and "Learn2 Set Your Browser's Start-Up Page." (Klein Decl. – Merely Descriptive – Ex. 10 at 1, 4, 6.)

On November 18, 2000, LCI's outside counsel, Jason Psaltides, filed a declaration with the PTO in connection with its '957 application. In his declaration, Psaltides asked the PTO to change the first-use date of LEARN.COM from October 1, 1998, to June 10, 1994, because "the former owner assigned the mark to applicant, and the date of first use in commerce should be changed to June 10, 1994." (Klein Decl. – Fraud Claims Reply – Ex. 3 at 1, December 15, 2008.) On

November 21, 2000, Psaltides responded to the PTO's Office Action letter concerning the '269 application by contending that the LEARN.COM mark should be registered despite its "descriptiveness" because "LEARN.COM has acquired distinctiveness on a national basis." (Klein Decl. – Fraud Claims – Ex. 1 at 111.) Psaltides wrote that from 1994 until 2000, LCI had spent "[s]everal million dollars" on "advertising the proposed mark in print advertisements, television and radio" and "continuous multi-million dollar advertising [was] being made annually to support the brand." (Klein Decl. – Fraud Claims – Ex. 1 at 111.)[2] Psaltides concluded that the "mark and products associated with [LEARN.COM] have acquired independent distinctiveness and in the stream of commerce [sic] for more than five years, and have been promoted by substantial advertisement dollars to cause a descriptive term to become a trademark distinctive to these brands in the minds of consumers." (Klein Decl. – Fraud Claims – Ex. 1 at 111-12.) The PTO granted LCI's registration of LEARN.COM based on the mark's acquired distinctiveness.

On December 5, 2005, TLI filed two applications with the PTO to register the LEARNING.COM mark. The first application, Serial No. 78/767,099 ("'099 application"), was for use of the mark in connection with International Class[3] ("IC") 041, which includes: "Education services, namely, conducting and monitoring interactive lessons and student activities via the Internet for grades K-12; educational testing and monitoring, namely, tracking and assessment of student

---

[2]Psaltides' statement, however, misrepresented the actual amount because LCI had spent only several thousand dollars. (Riley Dep. 372:5-373:4.)

[3]The United States has adopted the International Classification. *See* The Trademark Manual of Examining Procedure § 1401.02 ("As of September 1, 1973, the international classification of goods and services is the primary classification used by the United States, and it applies to all applications filed on or after September 1, 1973, and their resulting registrations, for all statutory purposes. *See* 37 C.F.R. § 2.85.").

progress on interactive lessons and student activities via the Internet for grades K-12." (Chitwood Decl. – Merely Descriptive – Ex. 3 at 1.) The second application, Serial No. 78/767,113 ("'113 application"), was for use of the mark in connection with IC 042, which mainly involves computer services and software. (Klein Decl. – Fraud Claims – Ex. 7.)

On June 22, 2006, the PTO's examining attorney refused registration of TLI's mark LEARNING.COM ('099 application), in part, because it was "merely descriptive" of its services.[4] (Chitwood Decl. – Merely Descriptive – Ex. 4 at 3.) On December 22, 2006, TLI refuted the PTO's conclusion of merely descriptive, stating that "[n]othing in the Mark LEARNING.COM gives any information that the underlying services are the provision and monitoring of interactive lessons and student activities via the Internet . . . . There is no information given . . . as to the nature of the underlying goods or services." (Chitwood Decl. – Merely Descriptive – Ex. 5 at 4.) TLI concluded that "[g]iven the vagueness of the meaning of the Mark [LEARNING.COM], as well as the numerous other possible goods and services the Mark might also describe, the Mark can be nothing other than suggestive," and that TLI therefore "strongly disagrees that the Mark LEARNING.COM is 'merely descriptive' of anything in particular, much less [TLI's] specific services." (Chitwood Decl. – Merely Descriptive – Ex. 5 at 4.) Thereafter, the PTO withdrew its rejection and allowed the '099 application to proceed.

A similar chain of events occurred in connection with TLI's '113 application to the PTO. In the '113 application, TLI sought registration of its mark for use in connection with: "Computer services, namely, application services provider services in the nature of hosting the software applications of others for access via the Internet; monitoring the software applications of others;

---

[4]The other reasons for refusal are not relevant to this motion.

computer software installation and maintenance." (Chitwood Decl. – Merely Descriptive – Ex. 7 at 1-3.) After the PTO rejected the '113 application as "merely descriptive," TLI again argued successfully that LEARNING.COM was not "'merely descriptive' of anything in particular, much less of [TLI's] specific services." (Chitwood Decl. – Merely Descriptive – Ex. 9 at 11.) Counsel who represented TLI in connection with the '099 and '113 applications also represent TLI in the present litigation.   TLI gave those attorneys authorization to make the statements regarding descriptiveness to the PTO. (Chitwood Decl. – Merely Descriptive – Ex. 1 at 17-19.)

## Legal Standard

Summary judgment is appropriate "if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED R. CIV. P. 56(c).  The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  All material facts are resolved in a light most favorable to the nonmoving party.  *Id.* at 331.  The court must accept all evidence and make all inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## Discussion

### I.   Fraud Claims and Counterclaims

TLI's Motion for Partial Summary Judgment on Fraud Claims and Counterclaims seeks an order from the court canceling LCI's federal Registration No. 2,699,107 ('269 application subsequently issued as 2,699,107) due to fraud on the PTO (Count I of TLI's Second Claim for Relief). Additionally, TLI requests an entry of judgment against LCI's Counterclaim V for fraud on

the PTO in trademark applications; and Counterclaim VI for attorneys' fees for an exceptional case.[5] The court will consider each of these issues in turn.

      A.     LCI's Fraudulent Registration – Second Claim for Relief, Count I

      TLI argues that LCI procured registration for the mark LEARN.COM by making knowing misrepresentations of material fact to the PTO in connection with its application to register the mark LEARN.COM. TLI contends it is entitled to judgment as a matter of law on its claim for cancellation of LCI's Registration No. 2,699,107. TLI's claim for cancellation is brought pursuant to the Lanham Act, 15 U.S.C. §§ 1064(3), 1119. Section 1064(3), provides that any person "who believes that he is or will be damaged" may petition to cancel a registered trademark on the ground, among others, that the "registration was obtained fraudulently." 15 U.S.C. § 1064(3).

      TLI must show that LCI knowingly made false and material misrepresentations of fact in connection with its '269 application to the PTO. *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986) (An applicant fraudulently procures registration when it "knowingly makes false, material representations of fact in connection with [its] application."). The parties do not dispute the materiality of LCI's representations about the duration of continuous use and the amount spent on advertising the LEARN.COM mark. Thus, to meet its initial burden, TLI must show that: (1) at least one of LCI's representations to the PTO was false, *and* (2) LCI knowingly made the misrepresentation(s). *See Torres*, 808 F.2d at 48 (emphasis added). TLI contends that when LCI made a claim of acquired distinctiveness of the LEARN.COM mark, it knowingly misrepresented the mark's first-use date and the amount LCI had spent on advertising the mark. TLI's motion for

---

    [5]LCI's Counterclaim VI seeking attorney's fees for an exceptional case is discussed below in Section II. E.

summary judgment should be granted only if a jury reasonably could find by clear and convincing evidence that LCI fraudulently procured registration of its marks. *Metro Traffic Control, Inc. v. Shadow Network, Inc.*, 104 F.3d 336, 340 (9th Cir. 1997) (A party seeking cancellation for fraudulent procurement of a registration "must prove the alleged fraud by clear and convincing evidence.").

When an applicant such as LCI makes a claim of acquired distinctiveness to the PTO, the PTO may accept "proof of substantially exclusive and continuous use" of the mark by the applicant "for the five years before the date on which the claim of distinctiveness is made . . . as prima facie evidence that the mark has become distinctive." 15 U.S.C. § 1052(f) (2006). Additionally, the Trademark Manual of Examining Procedure ("TMEP")[6] requires that "the distinctiveness created by the five years' use must relate to the goods or services specified in the application." TMEP § 1212.05(d)(6). When trying to prove acquired distinctiveness, "[l]arge scale expenditures in promoting and advertising goods and services under a particular mark are significant to indicate the extent to which a mark has been used." *Id.* § 1212.06(b). Therefore, when LCI resubmitted its '269 application to the PTO arguing that LEARN.COM should be registered as a distinctive mark, LCI was required to establish that: (1) the mark LEARN.COM had been in continuous use and was associated with the same or related goods and services for five years; and (2) that it had made large expenditures in promoting and advertising the goods and services associated with LEARN.COM.

_____

[6]Both the Supreme Court and the Federal Circuit Court have cited to the Trademark Manual of Exam Procedures as legal authority. *See, e.g., Qualitex Co. v. Jacobson Products, Co., Inc.*, 514 U.S. 159, 166 (1995); *In re Omega SA (Omega AG) (Omega Ltd.)*, 494 F.3d 1362, 1364-65 (Fed. Cir. 2007). Accordingly, the TMEP is a proper legal authority for this court.

LCI met this standard by representing that Whitman first used the mark LEARN.COM in 1994, in connection with his website *learn.com*, and that the goods and services associated with LEARN.COM under Whitman were sufficiently related to the goods and services associated with LEARN.COM under LCI. (Klein Decl. – Fraud Claims – Ex. 1 at 93.) LCI also represented to the PTO that it had spent "several million dollars" to advertise LEARN.COM. (Def.'s Opp'n Mem. – Fraud Claims – 22.) Thus, TLI must show either that the mark LEARN.COM had not been in continuous use for five years, and associated with the same or related goods and services, when LCI filed the '269 application and LCI was aware of this fact; or, that LCI knew it misrepresented the amount it spent on advertising LEARN.COM on its '269 application.

          1.      Material Misrepresentations of Fact – Continuous Use

In a discussion regarding the first-use date of a mark on an Internet website, the Ninth Circuit explained: "The Lanham Act grants trademark protection only to marks that are used to identify and to distinguish goods or services in commerce – which typically occurs when a mark is used in conjunction with the actual sale of goods or services." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999). Additionally, a mark "is not meritorious of trademark protection until it is used in public in a manner that creates an association among consumers between the mark and the mark's owner." *Id.* Thus, in order for the LEARN.COM mark to have been in continuous use for five years, Whitman must have first used LEARN.COM in 1994, *and* the products and services offered by Whitman under LEARN.COM must have been sufficiently related to the products and services presently offered by LCI such that the LEARN.COM mark was in continuous use.

a. First-Use Date

Although it is undisputed that Whitman registered the domain name *learn.com* in 1994, "mere registration of a domain name does not constitute the use of the domain name as a trademark." *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, 72 U.S.P.Q.2d (BNA) 1432, 1435 (N.D. Ill. 2004). The parties dispute Whitman's use of the site between 1994 and 1997, and the only evidence beyond the domain registration date offered by LCI regarding Whitman's use of the site prior to 1997 is the testimony of Riley that "[Mr. Whitman] told me that he was the original person that registered [the *learn.com* domain] back in the early '90s. As soon as he registered it, he put the website up and started to use it to promote his business." (Riley Dep. 57:9-20.). TLI contends that Whitman's representation is inadmissible hearsay because LCI offers it for the truth of the matter asserted, *see* FED. R. EVID. 801(c), and "only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Serv. Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

The court disagrees that the statement, as it is used here, constitutes inadmissible hearsay. The issue on summary judgment is whether LCI knowingly made a material false statement to the PTO when it represented a first-use date of 1994, for the mark LEARN.COM. Here, LCI relies on Whitman's statement to Riley simply to establish a genuine basis for LCI's representation to the PTO that the mark's first use date was 1994, and negate an intent to mislead the PTO about the first-use date. Riley's deposition testimony regarding the timing and purpose of Whitman's statements concerning the timing and use of LEARN.COM is admissible on summary judgment.

Additionally, TLI asserts that in an unrelated trademark-infringement case in 2006, LCI represented that the domain name *learn.com* was "first used in October 1997." (Klein Decl. – Fraud

Claims – Ex.1 at 85-91.) As such, TLI contends this statement constitutes LCI's judicial admission that the first use of LEARN.COM was not in 1994, which is the first-use date LCI represented on its '269 application. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) ("[S]tatements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court." (emphasis in original)). In *American Title*, the court held only that a statement in a trial brief could constitute a judicial admission at a later stage *in the same litigation*. As American Title "did not introduce the statement into evidence or object to the introduction of contradictory testimony," the court decided it was not an abuse of discretion to refuse to treat the statement as a binding admission after trial. *Id.* at 227.

In this instance, the court declines to find that an allegation made by LCI in an unrelated proceeding approximately seven years after the events in dispute here constitutes a judicial admission that Whitman first used the *learn.com* name in October 1997. Additionally, TLI has not provided context for the statement made by LCI in 2006. For example, did LCI's statement that the domain name was first used in October 1997, simply reference what could be established definitively with documentary evidence, i.e., at least since October 1997? This is not a circumstance in which LCI is propounding inconsistent allegations in the same litigation. Nor is there evidence before the court that this general allegation by LCI was relied upon for a determination in a related proceeding such that it would be an abuse of discretion for this court to refuse to treat the statement as a binding admission.

TLI has failed to establish as a matter of law that the first-use date of the mark was after 1994. LCI has presented some evidence to support its representation to the PTO regarding the first-use date of the mark LEARN.COM; namely, Riley's testimony, and the 1994 domain registration

of *learn.com*. Thus, there are disputed issues of material fact with respect to whether the mark LEARN.COM had been in continuous use for five years, beginning in 1994.

b. Continuous Use

The next question is whether the products and services associated with Whitman's mark LEARN.COM and LCI's use of the mark are sufficiently related to sustain continuity-of-use. A trademark is "a symbol of goodwill [that] has no independent significance apart from the goodwill that it symbolizes." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999). This accords with the Lanham Act's principle that a trademark does not merit protection unless it "creates an association among consumers between the mark and the mark's owner" because only then can a mark symbolize goodwill. *See Brookfield*, 174 F.3d at 1051. Thus, if the goodwill associated with the product it represents was altered, the mark would change as well, and continuity-of-use would be broken. Although there is no guidance regarding the requisite level of relatedness to sustain continuity-of-use in the present context, two areas of trademark law are instructive – assignment and likelihood of confusion.

The law regarding assignment of a mark provides that "any assignment of a trademark and its goodwill . . . requires the mark itself be used by the assignee on a product having substantially the same characteristics." *PepsiCo, Inc. v. Grapette Co., Inc.*, 416 F.2d 285, 288 (8th Cir. 1969). To prove that the products have substantially the same characteristics, the assignee must show more than the "fact that two uses are in the same 'class' for trademark purposes . . . ." *Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1113 (C.D. Cal. 2003). On the other hand, goods or services are "substantially distinct" if they "perform entirely different functions and appeal to vastly disparate consumer groups," and those differences "outweigh any superficial similarity." *interstate Net Bank*

v. *Netb@nk, Inc.*, 348 F. Supp. 2d 340, 351 (D.N.J. 2004); *see also Glow Indus.*, 273 F. Supp. 2d at 1113 ("Whether differences are important turns in this context on whether the products are designed to appeal to distinct or similar consumer groups.").

The law construing a likelihood of confusion also is instructive. To compare the similarity of marks in this context, courts will determine "not whether [the marks] are interchangeable, but whether the parties' products are the kind the public might very well attribute to a single source . . . ." *Autozone, Inc. v. Strict*, 543 F.3d 923, 931 (7th Cir. 2008) (internal quotations and citation omitted). In *Autozone*, the court found that the parties' products were related because there was "overlap" between the plaintiff's products and the defendant's services such that a "reasonable customer . . . could therefore conclude from the relatedness of the good and services provided by [the parties] that the marks are all attributable to a single source." *Id.*

The only evidence in the record to show the nature of Whitman's use of LEARN.COM is a screen-shot of *learn.com* from 1997. (Klein Decl. – Fraud Claims – Ex. 1 at 45.) The site's heading included the LEARN.COM mark and the subheading stated: "Business Communication Technologies." (Klein Decl. – Fraud Claims – Ex. 1 at 45.) The first sentence on the site stated: "Learn.com integrates new media technologies with proven instructional design methods to facilitate learning and turn information into knowledge." (Klein Decl. – Fraud Claims – Ex. 1 at 45.) In comparison, the first sentence of the *learn.com* site in 2001, stated that LCI is "the premiere destination for e-learning . . . . Learn.com has the e-learning solutions for your corporation, academic institution or government agency needs to compete – and succeed – in the global marketplace." (Klein Decl. – Fraud Claims Ex. – 1 at 120.) When comparing these descriptions, a reasonable customer may conclude that the products and services have "substantially the same

characteristics" and would therefore "attribute the services to a single source." *See Autozone*, 543 F.3d at 931. For example, a customer reasonably may associate both the 1997 LEARN.COM, and the 2001 LEARN.COM with online instructional and educational products and services.

TLI argues that there was no continuity between Whitman's use of LEARN.COM and Riley's use of LEARN.COM because the goodwill associated with Whitman's use of LEARN.COM did not transfer when Whitman sold or leased the domain name to LCI. TLI claims that "Riley's only interest was in the domain name itself; he had no interest in purchasing Whitman's business or pursuing Whitman's customers." (Pl.'s Mem. Supp. Summ. J. – Fraud Claims – 3.) LCI responds that it did intend "to pursue [Whitman's] customers, among others in its market, through the marketing conducted via its website." (Def.'s Opp'n Mem. – Fraud Claims – 4.) But, importantly, the continuation of goodwill is not dispositive because goodwill via retention of customers is not the only way that the goodwill associated with LEARN.COM could have been continuous. Rather, the court can find continuity of a mark when a reasonable customer could "conclude from the relatedness of the goods and services provided by [the parties] that the marks are all attributable to a single source." *See e.g., Autozone*, 543 F.3d at 931. There is an issue of fact regarding the continuity between Whitman's and LCI's use of LEARN.COM.

        2.     Knowing Misrepresentation – First-Use Date of LEARN.COM mark

Alternatively, for purposes of this motion, the court will assume that TLI established, as a matter of law, either that Whitman did not first use LEARN.COM in 1994, or that the products and services offered by Whitman under LEARN.COM were not sufficiently related to the products and services presently offered by LCI such that the LEARN.COM mark was not in continuous use. To

be entitled to summary judgment on its fraud claim, however, TLI must also establish that LCI knew
Whitman did not first use LEARN.COM in 1994.

As a preliminary matter, the parties dispute the applicable standard for finding an intent to
commit fraud on the PTO. TLI argues that the court should apply the *Medinol* standard used by the
PTO and the Trademark Trial and Appeals Board ("TTAB"). *See Medinol Ltd. v. Neuro Vasx, Inc.*,
67 U.S.P.Q.2d (BNA) 1205, 1209 (T.T.A.B. 2003). Under the *Medinol* standard, proof of specific
intent to commit fraud on the PTO "is not required, rather, fraud occurs when an applicant or
registrant makes a false material representation that the applicant or registrant knew or should have
known was false." *Id.* at 1209 (quotations and citation omitted). Conversely, LCI argues that the
court should apply the civil-fraud intent standard of whether the registrant had "knowledge or belief
that the representation is false." *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990).

The PTO and the TTAB use the *Medinol* standard because the signer of a federal-registration
application to the PTO is "clearly in a position to know (or to inquire) as to the truth of the
statements providing reason to believe." *Herbaceuticals, Inc. v. Xel Herbaceuticals, Inc.*, 86
U.S.P.Q.2d (BNA) 1572, 1577 (T.T.A.B. 2008). Additionally, "statements under oath are made
with a degree of solemnity requiring thorough investigation prior to signature and submission to the
USPTO." *Id.* Thus, a defendant's knowledge of its misrepresentation to the PTO, or its reckless
disregard for the truth, is all that was required to establish that the defendant knew or should have
known about the misstatement. *See Hurley Int'l LLC v. Volta*, 82 U.S.P.Q.2d (BNA) 1339, 1345
(T.T.A.B. 2006) (despite applicant's "honest belief" that the first-use date on their application was
correct, they nevertheless "were under an obligation to investigate thoroughly the validity of such
a belief before signing their application under certain penalties.")

The *Medinol* intent standard for fraud on the PTO is used universally in the TTAB and has been adopted by multiple district courts. *See, e.g., Monster Daddy, LLC v. Monster Cable Products, Inc.*, No. 6:06-293-HMH, 2007 WL 2199523, at *3 (D. S.C. July 27, 2007) (defendant's misunderstanding on its application to the PTO was "irrelevant" because "'[t]he appropriate inquiry is . . . not into the registrant's subjective intent, but rather into the objective manifestations of that intent'" (quoting *Medinol*, 67 U.S.P.Q.2d at 1209)); *Bay State Sav. Bank v. Baystate Fin. Servs., LLC*, 484 F. Supp. 2d 205, 220 (D. Mass. 2007) ("The 'knowledge' element [of a fraud on the PTO claim] is satisfied where the applicant made material statements it *knew or should have known* were false." (emphasis added)); *Univ. Nutrition Corp. v. Carbolite Foods, Inc.*, 325 F. Supp. 2d 526, 531 (D. N.J. 2004). Though a court in this district has cited to *Medinol* for the intent standard, it did not actually *apply* that intent standard. *See Treat, Inc. v. Dessert Beauty*, No. 05-923-PK, 2006 WL 2812770, at *13 (D. Or. May 5, 2006) ("'A trademark applicant commits fraud in procuring a registration when it makes material representations of fact in its declaration which it knows or should know to be false or misleading.'" (quoting *Medinol*, 67 U.S.P.Q.2d at 1209)).

Nevertheless, LCI points to the Ninth Circuit's decision in *Robi* to argue that the Ninth Circuit has not adopted the *Medinol* standard. *See* 918 F.2d 1439. In *Robi*, the Ninth Circuit stated that the intent standard for proving fraud on the PTO was "the registrant's knowledge or belief that the representation is false [and] the intent to induce reliance upon the misrepresentation." 918 F.2d at 1444. Further, a number of district courts in this circuit have relied upon the standard set forth in *Robi* in fraudulent procurement cases. *See, e.g., Levi Strauss & Co. v. Esprit US Distrib. Ltd.*, 588 F. Supp. 2d 1076, 1083-84 (N.D. Cal. 2008) ("When a party asserts a claim for fraud on the PTO, it must prove 'a false representation of fact [and] the registrant's knowledge or belief that the

Page 19 - Findings and Recommendation                                    [LB]

representation is false.'" (quoting *Robi*, 918 F.3d at 1444)); *Rogers v. Quik Check Fin., Inc.*, No.

CV03-1120-JE, 2004 WL 2026452 (D. Or. Sept. 9, 2004) ("A plaintiff must establish that . . . the

registrant knew or believed that the representation was false." (citing *Robi*, 918 F.3d at 1444));

*Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, No. CV 99-12980 DDP(MCX), 2002 WL

32006514, at *3 (C.D. Cal. Jan. 7, 2002); *Avery Dennison Corp. v. Acco Brands, Inc.*, No. CV99-

1877DT(MCX), 2000 WL 986995, at * 4 (C.D. Cal. Feb. 22, 2000).

This court is bound by Ninth Circuit precedent, and it must apply the *Robi* intent standard

to the present case. Therefore, LCI committed fraud on the PTO if it knew or believed that it was

making material misrepresentations in connections with its trademark application.

LCI insists that it made the requisite inquiries when Riley asked Whitman about his first-use

date of LEARN.COM and Riley reasonably relied upon Whitman's statements. Moreover, Psaltides

stated in his declaration:

> My basis for making this statement of first use in June 1994 for the mark
> LEARN.COM was my understanding that the previous owner, Mr. Alan Whitman,
> from whom [LCI] purchased the mark and domain registration, had used the
> LEARN.COM mark with respect to educational services from at least June 1994 until
> the time [LCI] purchased and began use of the mark.
>
> . . . .
>
> I believed the statements . . . to be true at the time I made them, and I do not currently
> believe otherwise.

(Jason Psaltides Decl. – Fraud Claims – ¶¶ 6 and 9, Nov. 28, 2008.) Riley also testified that, during

the relevant time, he believed that the LEARN.COM and the associated products had "acquired

independent distinctiveness in the stream of commerce for more than five years." (Riley Dep.

377:10-15.)

TLI has failed to establish as a matter of law that LCI knowingly misrepresented to the PTO either that Whitman did not first use LEARN.COM in 1994, or that the products and services offered by Whitman under LEARN.COM were sufficiently related to the products and services presently offered by LCI such that the LEARN.COM mark was in continuous use. A jury could reasonably believe the testimony of Riley and Psaltides, and determine that the misstatements were not knowing and there was no intent on the part of LCI to deceive the PTO.

    3. Knowing Misrepresentation – Advertising Dollars Expended

There is no dispute that LCI misrepresented that it had spent "several million dollars" to advertise LEARN.COM. (Def.'s Opp'n Mem. – Fraud Claims – 22 ("[TLI] and [LCI] both agree that [Psaltide's statement to the PTO that LCI has spent 'several million dollars' on advertising] was *not accurate* at the time it was made, because several thousand dollars had actually been spent." (emphasis in original)).) When trying to prove secondary meaning through acquired distinctiveness, "[l]arge scale expenditures in promoting and advertising goods and services under a particular mark are significant to indicate the extent to which a mark has been used." TMEP § 1212.06(b). Thus, the amount LCI spent to advertise its goods and services under LEARN.COM is a material fact. *See Herbaceuticals, Inc.*, 86 U.S.P.Q. at 1576 ("Statements regarding the use of the mark on the identified goods and/or services are certainly material to issuance of a registration."). Nevertheless, as discussed below, TLI is unable to establish as a matter of law that LCI knew its statement to the PTO that it had spent "several million dollars" on advertising the LEARN.COM mark was false.

In his declaration, Psaltides states that he "did not intend to make any misstatement to the PTO, but rather he intended to provide honest and accurate information." (Psaltides Decl. – Fraud Claims – ¶ 16.) According to Psaltides "he  inadvertently referred to 'several million dollars,'

Page 21 - Findings and Recommendation         [LB]

instead of 'several thousand dollars' in [his] November 21 Letter" to the PTO. (Psaltides Decl. – Fraud Claims – ¶ 16.) Specifically, Psaltides explained that over the past 20 years he has filed or assisted in filing more the 200 applications with the PTO, and the majority of those applications have emanated from two corporations that expend substantial funds annually on advertising and product promotion. (Psaltides Decl. – Fraud Claims – ¶ 3.) This uncontroverted testimony from Psaltides is sufficient to create a genuine issue whether Psaltides knew that he was misrepresenting a material fact in the '269 application.

In sum, TLI's motion for summary judgment should be denied because it has failed to establish as a matter of law either that LCI did not first use LEARN.COM in 1994, or the products offered by Whitman under LEARN.COM were not sufficiently related to the products presently offered by LCI such that the LEARN.COM mark was in continuous use. Moreover, TLI also failed in its burden on summary judgment to establish that there are no factual disputes regarding LCI's intent – LCI knew that LEARN.COM was not first used in 1994, including that the products were not sufficiently related; or LCI knowingly misrepresented the amount it spent on advertising the mark LEARN.COM on its '269 application to the PTO.

B.    TLI's Fraud on the PTO – Counterclaim V

Next, TLI moves for summary judgment against LCI's Counterclaim V that alleges TLI knowingly made false and material misrepresentations of fact to the PTO in connection with its '099 and '113 applications. Specifically, LCI challenges TLI's statement to the PTO on December 22, 2006, filed in response to the June 22 Office Action regarding the '099 application "that the mark LEARNING.COM 'is not merely descriptive, but is, instead, at most suggestive . . . .'" (Am. Answer and Countercl. ¶ 44.) LCI also challenges TLI's statement to the PTO on December 22,

2006, filed in response to the June 22 Office Action regarding the '113 application "that the mark LEARNING.COM 'is not merely descriptive, but is, instead, at most suggestive. . . ." (Am. Answer and Countercl. ¶ 48.)[7]

To prevail on summary judgment, TLI must show as a matter of law that it did not knowingly make false and material misrepresentations of fact in connection with its '099 and '113 applications to the PTO. *See Torres*, 808 F.2d at 48 ("Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with [its] application."). TLI can meet this burden by showing at least *one* of the following: (1) its representations to the PTO in connection with the '099 and '113 applications were not material facts; (2) its representations were not false; or (3) it did not know that the representations were false. *Id.*

---

[7] LCI also alleges in Counterclaim V that TLI misrepresented the first-use date of the LEARNING.COM mark (Am. Answer and Countercls. ¶¶ 55-60.) Specifically, LCI alleges that by October 10, 2001, TLI's reported first-use date, TLI had not used LEARNING.COM "on the full range of services listed in the '099 application." (Am. Answer and Countercls. ¶ 55.) According to LCI, TLI thereby knowingly made misrepresentations to the PTO in connection with the '099 application.

In its motion for summary judgment TLI argued, alternatively, that LCI failed to identify the specific nature of any alleged non-use and, even if it had, LCI's claim must still fail as a matter of law because "[t]he claim of a date of first use is not a material allegation as long as the first use in fact preceded the application date." *Pony Express Courier Corp. of Am. v. Pony Express Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989). TLI charges that LCI did not allege that TLI failed to use its LEARNING.COM mark on the full range of recited services as of December 5, 2005, the date TLI filed the '099 application, nor could it prove such non-use. LCI did not address this issue in its Opposition brief. LCI's failure to make any argument in support of its first-use allegations effectively abandons that course of argument. *See, e.g., Grenier v. Cyanamid Plastics*, 70 F.3d 667, 677 (1st Cir. 1995) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived.")

1.    Material Misrepresentations of Fact – Merely Descriptive

TLI argues that its representations to the PTO that LEARNING.COM was not "descriptive" were not facts, but were "legal argument[s] that cannot support a claim for fraud on the PTO as a matter of law." (Pl.'s Mem. Supp. Summ. J. – Fraud Claims – 20.) LCI disagrees with TLI's assertion that its representations were legal arguments. Rather, LCI insists that the representations were "definitive, categorical statements of fact that constitute fraud." (Def.'s Opp'n Mem. – Fraud Claims – 11.) LCI argues that by representing to the PTO that its mark was "at most suggestive," TLI "misrepresented the *ultimate fact* of whether or not its LEARNING.COM mark describes its services." (Def.'s Opp'n Mem. – Fraud Claims – 12 (emphasis in original).) Ultimate facts in a trademark context are "conclusions to be drawn from the evidentiary facts" and "are based on historical or evidentiary fact . . . ." *In re Bush Bros. & Co.*, 884 F.2d 569, 571 (Fed. Cir. 1989).

Initially, the court notes that LCI asserts that "law of the case" precludes this court from finding that TLI's representations regarding descriptiveness are legal arguments and not facts. According to LCI, on two previous occasions the court rejected this same argument by TLI. The doctrine of the law of the case generally prevents reconsideration of issues that the same or a higher court already decided in the same case. *See, e.g., Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1093 (9th Cir. 1998). For the doctrine of the law of the case "to apply, the issue in question must have been decided explicitly or by necessary implication" in the previous decision. *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (quotation omitted). Previously, the court determined simply that the allegations in LCI's Counterclaim V satisfied the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See The Learning Internet v. Learn.com, Inc.*, CV 07-227-AC, 2008 WL 2037282, *5-6 (D. Or. May 6, 2008). That decision does

not include an analysis of the issue presently before the court, nor will this court assume in this instance that such analysis was implicitly undertaken. Additionally, Judge Marsh adopted the Findings and Recommendations without explaining his reasoning. *See The Learning Internet v. Learn.com, Inc.*, CV 07-227-AC, 2008 WL 2037282 (adopting Findings and Recommendation without discussion). Accordingly, TLI's arguments here are not barred by law of the case.

Moving to the merits of the issue, a trademark is defined in 15 U.S.C. § 1127 as including "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." To be registered, a mark must be capable of distinguishing the applicant's goods from those of others. *Id.* at § 1052. Marks can be classified in categories of generally increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir. 1976). The Supreme Court has explained that "[t]he latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Alternatively, generic marks – those that "refe[r] to the genus of which the particular product is a species," are not registrable as trademarks. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Finally, a mark that is merely descriptive of a product is not considered inherently distinctive because it does not inherently identify a particular source and, therefore, cannot be protected. *Two Pesos, Inc.*, 505 U.S. at 769. Descriptive marks may, however, acquire the distinctiveness to allow them to be protected under the Act if it "has become distinctive

of the applicant's goods in commerce." 15 U.S.C. §§ 1052(e), (f); *see also Park 'N Fly, Inc.,* 469 U.S. at 194, 196. This acquired distinctiveness is generally called "secondary meaning."

As explained above, on June 22, 2006, the PTO examiner issued a non-final office action rejecting the '099 and '113 applications on the ground that the mark LEARNING.COM was merely descriptive. Specifically, the PTO stated "[r]egistration is refused because the proposed mark merely describes applicant's services. Trademark Act Section 2(e)(1), 15 U.S.C. § 1052(e)(1); TMEP §§ 1209 *et seq.*" (Chitwood Decl. – Merely Descriptive – Ex. 4 at 3.) In its December 22, 2006 response, TLI argued that the LEARNING.COM mark was at most suggestive and registrable on the Principal Register. A review of TLI's Response to Office Action on the '099 and '113 applications reveals that its statement was propounded as argument in response to the PTO determination that the mark was merely descriptive. In this instance, TLI was simply advancing a position that may or may not have persuaded the PTO. *See Life Technologies, Inc. v. Clontech Laboratories, Inc.,* 224 F.3d 1320, 1323, (Fed. Cir. 2000) ("[I]n making the argument the inventors merely advocated a particular interpretation of the teachings of the . . . article . . . which the Examiner was free to accept or reject. This argument does not contain any factual assertions that could give rise to a finding of misrepresentation."); *Akzo N.V. v. U.S. Int'l Trade Comm'n,* 808 F.2d 1471, 1482 (Fed. Cir. 1986) ("The mere fact that DuPont attempted to distinguish the [invention] from the prior art does not constitute a material omission or misrepresentation. The examiner was free to reach his own conclusion regarding the [invention] based on the prior art in front of him."). *See also Rowe Int'l. Corp. v. Ecast,, Inc.,* 241 F.R.D. 296 (N.D. Ill. 2007) (fraud must relate to a misrepresentation of fact, therefore, a legal argument by a prosecuting attorney that does not misstate material facts, but perhaps provides an insincere opinion, will not provide a bases to invoke the crime-fraud exception).

*See also Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 602l (S.D.N.Y. 2004) ("A

strategy of attempting to convince the FDA of a particular position is appropriate advocacy, and not

a fraud.") TLI's statements that the mark was not merely descriptive but, rather, at most suggestive

were neither material misstatements of fact nor constituted the withholding of an essential fact as

required to state a claim for fraud on the PTO. *Compare Deflecta-Shield Corp. v. Kar-Rite Corp.*,

229 U.S.P.Q. (BNA) 743, 747 (N.D. Ill. 1986) (trademark applicant has a duty to disclose the fact

that a design is generic at the time of application to the PTO and failure to do so may constitute fraud

on the PTO).

In a case factually similar to this case, defendant filed a counterclaim against plaintiff

Whirlpool and alleged that Whirlpool committed fraud on the PTO while applying for and receiving

registration of the mark WHISPER QUIET. *Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*, No.

1:03-CV-414, 2005 WL 3088339, at *25 (W.D. Mich. Nov. 17, 2005). The counterclaim identified

four of Whirlpool's representations as fraudulent, the first being that WHISPER QUIET mark "is

not a common or merely descriptive name or feature of applicant's goods . . ." *Id.* The court

concluded that:

> Many of defendant's allegations of fraud do not involve matters of fact. Defendants
> allege fraud arising from plaintiffs' failure to concede in their trademark application
> that the term Whisper Quiet was generic and its assertions that the mark was fanciful
> and not descriptive. These are matters of characterization and opinion, not fact.

*Id.*

TMEP provides additional support for TLI's argument that whether a mark is "descriptive"

or "suggestive" is a legal argument, not a fact. It states that "[t]he great variation in facts from case

to case prevents the formulation of specific rules for specific fact situations. Each case must be

decided on its own merits." TMEP § 1209.01(b) (citing *In re Ampco Foods, Inc.*, 227 U.S.P.Q.

(BNA) 331 (T.T.A.B. 1985); *In re Venturi, Inc.*, 197 U.S.P.Q. (BNA) 714 (T.T.A.B. 1977)). TMEP also requires that the "examining attorney must consider the evidence of record to determine whether a mark is merely descriptive or whether it is suggestive or arbitrary." TMEP § 1209.02 (citing *In re the Noble Co.*, 225 U.S.P.Q. (BNA) 749, 750 (T.T.A.B. 1985)). Additionally, the "examining attorney may request that the applicant submit additional explanation or materials to clarify the nature of the goods or services." TMEP § 1209.02 (citing 37 C.F.R. § 2.61(b)).

TLI's statements in its December 2006 submissions to the PTO and challenged here by LCI were not material facts, but rather legal argument. Thus, the statements relied upon by LCI in its Counterclaim V as the basis for its claim of fraud by TLI on the PTO were not material factual representations, a required element to state a claim for fraud. Accordingly, TLI's request for summary judgment against LCI's Counterclaim V should be granted.

II.    Trademark Infringement Claims

LCI alleges that TLI's use of the LEARNING.COM mark in connection with TLI's services infringes LCI's LEARN.COM and LEARN2.COM marks. TLI's Motion for Partial Summary Judgment on Trademark Infringement Related Claims seeks an entry of judgment against LCI on Count I of its First Claim for Relief; namely a declaratory judgment that TLI has not infringed LCI's trademarks. In addition, TLI moves for an entry of judgment against LCI's Counterclaims as follows: (1) Counterclaim I, alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114-1118; (2) Counterclaim II, alleging state and common-law trademark infringement in violation of OR. REV. STAT. § 647.095; (3) Counterclaim III, alleging federal and state unfair competition in violation of 15 U.S.C. § 1125(a)(1); (4) Counterclaim IV, alleging state unfair business and trade practices in violation of OR. REV. STAT § 646.608; and (5) Counterclaim VI,

alleging a right to attorney's fees pursuant to 15 U.S.C. § 1117(a), based on bad faith and willful infringement.

In a trademark infringement case the question is whether there will be a likelihood of confusion between the parties' allegedly related goods and services. *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005). The burden of proving that two marks create a likelihood of confusion rests on the claimant. *See KP Permanent Make-Up v. Lasting Impression*, 543 U.S. 111, 117 (2004). This burden of proof applies to a claimant's federal, state, and common-law based claims. *M2 Software, Inc.*, 421 F.3d at 1080. To defeat a motion for summary judgment on the issue of likelihood of confusion, the claimant must show sufficient evidence to permit a rational trier of fact to find that confusion among the relevant group is "'probable,' not merely 'possible.'" *Id.* at 1085 (quoting *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir. 1996)). A district court may determine likelihood of confusion as a matter of law through summary judgment despite the factual analysis of a likelihood-of-confusion case. *Id.* at 1079-80; *Murray*, 86 F.3d at 860-61.

A.     Trademark Infringement - Count I (First Claim for Relief) and Counterclaim I[8]

LCI contends that TLI's use of the LEARNING.COM mark infringes LCI's marks by creating a likelihood of confusion between the marks. The Lanham Act provides for civil liability against any "person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . . which (A) is *likely to cause*

---

[8]In this case, the court applies the same legal standard and analysis for determining likelihood of confusion to both Count I of TLI's First Claim for Relief, seeking a declaration non-infringement, and LCI's Counterclaim I, alleging trademark infringement. The resolution of the trademark related claims here turns on whether TLI's mark LEARNING.COM creates a likelihood of confusion between the parties' goods and services.

*confusion, . . . as to the origin, sponsorship, or approval*" of the goods or services.  15 U.S.C. §

1125(a)(1)(A) (emphasis added).  For a finding of a likelihood of confusion, the mark must be

"likely to confuse an *appreciable* number of people as to the source of the product." *Entrepreneur*

*Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002) (emphasis in original).  The Ninth Circuit

follows the general rule that "if the goods are *totally unrelated*, there can be no infringement because

confusion is unlikely." *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979) (emphasis

added).

      This court must analyze the parties' claims on the issue of likelihood of confusion between

the marks using the "*Sleekcraft* factors." *See Sleekcraft*, 599 F.2d at 348-49.  The *Sleekcraft* factors

are:  (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence

of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to

be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of

expansion of the product lines. *Id.* at 348-49.

      The Ninth Circuit has clarified that none of the factors are individually dispositive; thus, the

court must consider the "totality of facts in a given case." *Entrepreneur Media*, 279 F.3d at1140

(internal quotations and citation omitted).  Nor should the court mechanically apply the *Sleekcraft*

factors as "[s]ome factors are much more important than others, and that the relative importance of

each factor will be case-specific." *Brookfield*, 174 F.3d at 1054; *see also Entrepreneur Media*, 279

F.3d at 1141 ("[W]e do not decide whether confusion is likely by considering mechanically the

number of *Sleekcraft* factors that weigh in favor of either party, or by giving the same weight to a

particular factor from case to case.").

The three most important *Sleekcraft* factors in evaluating the likelihood of confusion for goods and services sold on the Internet are: (1) the similarity of the marks; (2) the relatedness of the goods or services; and (3) the parties' simultaneous use of the Internet as a marketing channel. *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). When these factors, referred to as the "Internet Trinity," suggest confusion is likely, the other *Sleekcraft* factors must weigh strongly against a likelihood of confusion to avoid a finding of infringement. *Brookfield*, 174 F.3d at 1058. Conversely, if these three factors do not "clearly indicate" a likelihood of confusion, then a district court may analyze the facts under the remaining *Sleekcraft* factors. *Interstellar Starship Services, Ltd., Epix, Inc.*, 304 F.3d 936, 943 (9th Cir. 2002).

        1.     The Internet Trinity

             a.     Similarity of the Marks

The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com*, 202 F.3d at 1205. When determining similarity of marks, the court must view "the trademark as a whole, as it appears in the marketplace and the circumstances surrounding the purchase of the [products]." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993). Similarity of the marks is tested on three levels: sight, sound, and meaning. *Sleekcraft*, 599 F.2d at 351. "Although similarity is measured by the marks as entities, similarities weigh more heavily than differences." *Id.* Additionally, "'the same standard' applies to both registered and unregistered trademarks." *GoTo.com*, 202 F.3d at 1204 n.3 (quoting *Brookfield*, 174 F.3d at 1046 n.6).

The parties dispute how the requirement that each mark be considered as it is "encountered in the marketplace" be construed. TLI argues that the court should view the marks as they appear

on the websites, in full color with specialized fonts and use of graphic effects, because both parties

rely on the Internet to market and sell their products. LCI disagrees and argues that its infringement

claim is grounded in confusion based on its rights in the word marks, rather than stylized word

design. LCI also contends that some consumers do not always see the stylized form of the parties'

marks, but see only the typed words.

Ninth Circuit precedent dictates that when two companies use the Internet "as a marketing

and advertising facility" the marks must be evaluated as they are "utilized in the marketplace," which

requires "analysis of the marks in their [I]nternet usage, not simply as the terms are pronounced or

viewed in the abstract." *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1174-75 (9th Cir. 2007).

Therefore, the court's analysis of the parties' marks' sight, sound, and meaning is based on the

marks as they appear on the parties' respective websites.

### I. Sight

When considering the similarity of marks through sight, the Ninth Circuit considers whether

"[t]o the eye, the words are similar," whether "the names appear dissimilar when viewed in

conjunction with the logo," and whether the name is "usually accompanied by [an] additional

trademark . . . ." *Sleekcraft*, 599 F.2d at 351. TLI argues that "the parties' ubiquitous logos create

unique commercial impressions that are easily distinguishable from one another." (Pl.'s Mem. Supp.

Summ. J. – Trademark Claims – 23.)  In support of its assertion, TLI relies on a case in which the

court found the marks visually dissimilar in part because of one party's "use of a different color

scheme (*i.e.* purple, yellow, and white contrasted with plaintiff's teal and black)." *First Franklin

Fin. v. Franklin First Fin., Ltd.*, 356 F. Supp. 2d 1048, 1051 (N.D. Cal. 2005).

Indeed, the two word marks do look dissimilar – TLI's longer word mark is black, green, orange, and blue with symbols in place of the letters "a," "g," and "o" in the mark. In contrast, LCI's word mark is black and gray, consisting entirely of letters and casting a faint shadow. Additionally, the LCI mark is preceded by a blue and green spherical logo with an imbedded white "L". Nor is TLI's word mark visually similar to LCI's LEARN2.COM logo as the latter is either black or gray with a red "2", and there is a distinctive swooping line under the name.[9]

Finally, LCI's argument that the differences between the parties' word marks is irrelevant because LCI's word mark is registered while TLI's word mark is not, is contrary to Ninth Circuit precedent. In *GoTo.com*, the court determined that "the same standard applies to both registered and unregistered trademarks." 202 F.3d at 1204 n.3. Accordingly, the court finds that the parties' marks are not visually similar.

<div align="center">ii. Sound</div>

Sound is important because "reputation is often conveyed word-of-mouth." *Sleekcraft*, 599 F.2d at 351. In the context of marks used on the Internet, sound may not be as important because "Internet users do not utilize verbal communication as a basis for the services that they seek." *Perfumebay.com Inc.*, 506 F.3d at 1175. Nevertheless, the *Sleekcraft* court recognized that "two sounds can be distinguished," even if "the difference is only in a small part of one syllable."

---

[9]The parties' respective marks are:



*Sleekcraft*, 599 F.2d at 351-52.  For example, the *Sleekcraft* court found that "sleekcraft" and "slickcraft" were similar.  *Id.* at 352.

TLI contends that the sound of the marks is not significant because they are used on the Internet, and not advertised on the radio.  Moreover, the marks differ phonetically because the latter has an additional syllable.  Additionally, TLI argues that "LEARN2.COM" and "LEARNING.COM" are phonetically different.  LCI does not refute that the two marks sound different.  The court finds that the parties' marks are not aurally similar.

### iii. Meaning

"Closeness in meaning can itself substantiate a claim of similarity of trademarks." *Sleekcraft*, 599 F.2d at 352.  For example, in *Sleekcraft* the court found the marks to be similar because the words "sleekcraft" and "slickcraft" are "virtual synonyms." *Id.*  LCI argues that the marks are nearly identical because both parties use the root word "LEARN" followed by the Internet domain indicator ".COM."  TLI argues that LEARN.COM is a verb and LEARNING.COM is a noun.  Similarly, TLI explains that "LEARN2" is a verb followed by a preposition.

The court agrees the words are different parts of speech, "learning" is an inflected form of "learn."  MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007).  Nevertheless, "learning" is defined as "the act or experience of one that *learns*." *Id.* (emphasis added).  Thus, a reasonable jury could find that the meaning of the marks are similar.

Under the first Internet Trinity factor – similarity of marks – TLI has established that the marks are not optically or aurally similar.  The meaning of the marks, however, is similar.  Nevertheless, this factor weighs slightly against finding infringement.

b.      Relatedness of Goods and Services

The likelihood of confusion is greater if the goods are related or complementary. *Sleekcraft*,

599 F.2d at 350.  If the goods are related, "the danger presented is that the public will mistakenly

assume there is an association between the producers of the related goods, though no such

association exists."  *Id.*  Thus, less similarity between the marks will satisfy this factor when the

"goods are complementary, the products are sold to the same class of purchasers, or the goods are

similar in use and function."  *Id.* (internal citations omitted).

TLI makes two arguments in support of its claim that the goods and services associated with

LCI's and TLI's marks are not so related as to create a likelihood of confusion. First, TLI argues that

the associated goods and services are not related because TLI offers "K-12 curriculum and

assessment tools," while LCI's "services are not designed to address the very specific needs of K-12

schools." (Pl.'s Mem. Supp. Summ. J. – Trademark Claims – 16.) LCI responds that the goods are

related because both "parties' products and services involve delivering educational courses and

content over the Internet to students, including educational courses involving technology, computers

and software." (Def.'s Opp'n Mem. – Trademark Claims – 1.)

To support its first argument, TLI relies on the Ninth Circuit's decision in *Murray*, 86 F.3d

858.  In *Murray*, plaintiff, a man who used the mark "America Speaks" in connection with man-on-

the-street interviews that he conducted for business clients, sued defendant, a cable television

network that used the mark "America's Talking" in connection with interactive national polling

surveys. The court upheld the district court's dismissal of the case because there was no likelihood

of confusion, explaining that:

[Plaintiff] conducts "man-on-the-street" consumer surveys and sells his services to business clients for use in television commercial advertising. He does not produce network television programming. By contrast, [defendant's] "America's Talking" network offers talk-show television programming to cable television viewers. [Defendant's] "polling" consists of allowing viewers to respond to questions by calling telephone numbers, the results of which are occasionally distributed to the news media.

*Murray*, 86 F.3d at 861.

The present case, however, is distinguishable from the circumstances in *Murray*. Notably, in *Murray*, plaintiff and defendant did not operate their businesses through the same medium. As opposed to defendant, plaintiff was not in the television-programming business; he conducted interviews that he sold to clients who were in the advertising business. *Id.* at 860. Here, LCI and TLI operate through the same medium – the Internet. Additionally, both parties sell goods and services associated with the category, albeit broad, of online education.

TLI argues that even assuming the parties are both involved in the same general field of "online education," that alone does not mean the respective products are similar. TLI relies upon a number of cases in which a court found the parties' products to be unrelated despite the products' similarities. *See, e.g., Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270 (3d Cir. 2001); *Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F2d 713 (Fed. Cir. 1992); *Astra Pharmaceuticals Prods. v. Beckman Instruments*, 718 F.2d 1201 (1st Cir. 1983).

Only three of TLI's cited cases were decided on summary judgment, and those three are either distinguishable or indicate that this factor weighs against granting summary judgment in the present case. For example, in *Astra*, the claimant sold pharmaceutical products solely to hospital pharmacies, and the alleged infringer sold pharmaceutical products solely to hospital laboratories. 718 F.2d at 1206. The court held that although the parties manufactured and sold goods "in the same

broad health care field," there was no overlap in customer base because the different parts of a hospital "constitute[d] different markets for the parties' respective products." *Id.* Thus, *Astra* is factually distinguishable from the present case as there was no overlap in the customer base because the parties' products were sold exclusively to distinct and different groups of people.

The Ninth Circuit's decision in *M2 Software, Inc.* is more closely analogous to the present case. In *M2 Software, Inc.*, the claimant, M2 Software, brought suit against the alleged infringer, Madacy. 421 F.3d at 1078. M2 Software "primarily developed and licensed database software used for processing and managing data of major record companies' musical works." *Id.* at 1077. Madacy "is a recording and distribution company that specializes in low-price collections of recorded music" that generally "licenses the music it distributes from other companies." *Id.* The court recognized that "[a]t a minimum, both M2 Software and Madacy distributed music and CDs" and thus held that this factor weighed in favor in infringement, "but only slightly because the genres of the music CDs are very significantly different." *Id.* at 1082. *M2 Software* is applicable to the situation here because the parties have related goods and services at their core, but operate in largely different markets. Despite a minimum of similarities between LCI's and TLI's products, it is sufficient to find this factor weighs slightly in favor of infringement.

In its second argument, TLI contends that the goods and services would not cause confusion because the parties share few, in any, customers or potential customers. TLI alleges that K-12 entities are only a small portion of LCI's customer base. TLI also argues that LCI has only 11 customers in the education industry, comprising 2.5 percent of LCI's customer base, and LCI "did not attract a single new K-12 customer between May 2005" and 2008. (Pl.'s Mem. Supp. Supp. J. – Trademark Claims – 8.) In response, however, LCI points to four examples of customers using

LCI services with K-12 students. (Don Cook Decl. – Trademark Claims – ¶ 6, Dec. 4, 2008.) LCI also alleges that it "markets to K-12 institutions through a software grant program it created in 2005." (Cook Decl. – Trademark Claims – ¶ 9.)

To support its argument that different customers negate the possibility of confusion, TLI relies on precedent from the Federal Circuit. *See Elec. Design & Sales, Inc.*, 954 F.2d at 716. To assess likelihood of confusion in that case, the court's "essential inquiry . . . [was] whether there [was] likely to be a sufficient overlap of the respective purchasers of the parties' goods and services to confuse actual and potential purchasers." *Elec. Design*, 954 F.2d at 716. The decision in *Electric Design* is not relevant to the court's analysis here because the Ninth Circuit requires an eight-step, totality-of-the-circumstances, analysis rather than focusing on a single factor. *See Sleekcraft*, 599 F.2d at 348-49 (considering "actual confusion" of customers as one of eight factors in determining likelihood of confusion).

Once again the court turns to the Ninth Circuit's analysis in *M2 Software* for guidance on the question of whether the parties' respective goods and services are related. In *M2 Software*, the court found only a "slight" proximity factor between the manufacturers of an identical product, CDs and music downloads, based on the different music genres involved. Here, while the products are arguably related under LCI's broad characterization of educational materials delivered over the Internet, both the functionality and the customers of the respective products are distinct. TLI's technology is used to teach core curriculum to elementary and secondary school students and sold exclusively to teams of K-12 educators. In contrast, LCI's products are used primarily for training and education in the workplace and are sold almost exclusively to business and corporate entities. Further, the LCI products sold under the LEARN2.COM mark are low cost, i.e., often less than $20,

tutorials sold to individuals. Moreover, as discussed more fully in the "degree of care" analysis below, the court finds that the sophisticated customers of these technical software products understand the differences between TLI's goods and services and those of LCI's, and those sophisticated customers are unlikely to confuse the source of those products. Similarly, a customer looking to purchase directly a low cost "how to" tutorial software sold under the LEARN2.COM mark is unlikely to mistake that product with an educational software system sold to school districts. Based on the significant disparities between the parties' respective goods and services and customers, the court finds this factor weighs only slightly in favor of finding infringement.

<p style="text-align:center">c.    Simultaneous Use of the Web to Market</p>

The likelihood of confusion increases when the marks are used in "convergent marketing channels." *Sleekcraft*, 599 F.2d at 353. Under this factor, the Ninth Circuit will consider whether both goods were "sold under the same roof except at [trade] shows," whether the "normal marketing channels" used by both companies are "parallel," whether the "same sales methods are employed," the similarity between "price ranges," whether the goods are advertised in the same magazines, and how retail dealers "promote the lines." *Id.*

TLI argues the parties operate in different marketing channels because they advertise in different trade publications, exhibit at different trade shows, market to different decision makers and sell to different customers. Regarding LEARN2.COM specifically, TLI contends that nothing "in the record suggests that the LEARN2 products are advertised in K-12 trade publications, exhibited at K-12 trade shows or marketed to the same potential purchasers;" rather, "the LEARN2 products are marketed on consumer websites like [*Amazon.com*]." (Pl's Mem. Supp. Summ. J. – Trademark Claims – 32.)

LCI contends that both parties use the Internet to advertise their products, to market their respective services, and to deliver many of those services. *See GoTo.com, Inc.*, 202 F.3d at 1207 ("the Web, as a marketing channel, is particularly susceptible to a likelihood of confusion"). *But see Playboy Enters v. Netscape Commc'ns*, 354 F.3d 1020, 1028 (9th Cir. 2004) (the fact that two parties used the Internet "merits little weight" under this factor because "[g]iven the broad use of the Internet today, the same could be said for countless companies").

In *M2 Software, Inc.*, Madacy claimed that there were convergent marketing channels because both parties launched their products at the same trade show, their marks had been advertised in similar magazines, and both had established presences in the music industry in the same cities. 421 F.3d at 1083. The Ninth Circuit, however, found that this factor "weighs heavily" against finding infringement because of the "important distinctions in the marketing channels used." *Id.* at 1083-84. For example, unlike Madacy, M2 promoted its products in specialty music industry publications, and although the parties launched their products at the same trade show, they did so ten years apart. *Id.* Additionally, even though parties sold their products over the Internet through *Amazon.com*, "M2 Software failed to provide evidence of sales attributable to M2 Software's website." *Id.* at 1084.

Similar to the parties in *M2 Software, Inc.*, TLI and LCI have "important distinctions in the market channels used." *Id.* at 1084-84. As TLI points out, the parties advertise in different trade publications and exhibit at different trade shows. Moreover, the fact that they both use the Internet does not indicate a likelihood of confusion *per se*. The court finds this factor weighs against finding infringement.

In sum, here the Internet Trinity factors – the similarity of the marks, the relatedness of the goods or services, and the parties' simultaneous use of the Web as a marketing channel – do not "clearly indicate" a likelihood of confusion between the parties' marks. As such, the court will consider the remaining *Sleekcraft* factors: (1) strength of the mark; (2) evidence of actual confusion; (3) type of goods and the degree of care likely to be exercised by the purchaser; (4) defendant's intent in selecting the mark; and (5) likelihood of expansion of the product lines.

        2.        Remaining *Sleekcraft* Factors

            a.        Strength of the Mark

The strength of a mark depends on its categorization as distinctive, suggestive, or descriptive. *Sleekcraft*, 599 F.2d at 349. The more distinctive the mark, the greater its "conceptual strength." *M2 Software*, 421 F.3d at 1080. The *Sleekcraft* court explains:

> A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses. A descriptive mark tells something about the product; it will be protected only when secondary meaning is shown. In between lie suggestive marks, which subtly connote something about the products. Although less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning.

599 F.2d at 349 (internal citations omitted). Suggestive or descriptive marks are "inherently weak" but "may be strengthened by such factors as extensive advertising, length of exclusive use, [and] public recognition." *Entrepreneur Media*, 279 F.3d at 1144 (citation and internal quotation marks omitted); *see also M2 Software, Inc.*, 421 F.3d at 1081 ("a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success").

TLI claims that neither of LCI's marks are entitled to protection because they are descriptive and, therefore, inherently weak. LCI contends that its marks are sufficiently strong to necessitate

Page 41 - Findings and Recommendation                [LB]

protection against infringement and, in any event, asserts that TLI is "judicially estopped from making the argument based on [TLI's] contrary assertions to the PTO regarding its nearly identical mark." (Def.'s Opp'n Mem. – Trademark Claims – 23.) As set forth in greater detail below in Section III.C. below, there are factual questions that must be resolved before the court can determine whether judicial estoppel should apply. Moreover, as discussed in Section III.A. below, there is a genuine issue of material fact regarding whether LCI's mark is descriptive; thus, the relative strength of LCI's mark is unsettled.

b.      Evidence of Actual Confusion

Evidence that the two marks have already created customer confusion "is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. Because of the difficulties in obtaining evidence of actual confusion, "the failure to prove instances of actual confusion is not dispositive." *Id.* at 353. Therefore, "this factor is weighed heavily only when there is evidence of past confusion." *Id. But see Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005) (when there is only "scant evidence of actual confusion in the record," the lack of evidence will weigh in favor of the alleged infringer).

The only evidence in the record of confusion in connection with the LEARN.COM mark is a single instance in which a representative of the International Institute for Learning contacted TLI. Upon being told the nature of TLI's business, the representative indicated that she may have been thinking of LCI. (Julie A. Brown Decl. – Trademark Claims – Ex. 5 at 8, Nov. 14, 2008.) There is no evidence in the record, however, of actual confusion. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 n.7 (despite several dozen inquires over the years about whether the parties where related, the court determined that "[w]ithout some other evidence of actual confusion, the inquiries were too

Page 42 - Findings and Recommendation                                        [LB]

ambiguous to demonstrate actual confusion"). Additionally, there is no evidence in the record of actual confusion between LEARNING.COM and the LEARN2.COM mark.

In the absence of evidence of actual confusion, this factor weighs in favor of TLI. *See, e.g., Surfvivor Media*, 406 F.3d at 633; *Cohn*, 281 F.3d at 842 (court determined that because parties used same trademark in same city for six years to market closely related products some evidence of actual confusion should be available); *Nabisco, Inc. v. PF Brans, Inc.*, 191 F.3d 208, 228 (9th Cir. 1999) (lack of evidence about actual confusion after an ample opportunity for confusion "can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion").

c.     Type of Goods/Degree of Care

To determine the likelihood of confusion to the public, the standard is the typical buyer exercising ordinary caution. *Sleekcraft*, 599 F.3d at 353. "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." *Id.*; *see also M2 Software*, 421 F.3d at 1084 ("the purchasers of [the products] are highly sophisticated members of the music industry. . . . [r]egardless of any trademark, they would be well informed about the nature [of the products] before making a decision"). The court in *M2 Software* also noted that there is almost no possibility of sophisticated members of a particular industry being confused about the products and services in that industry. 421 F.3d at 1084.

TLI argues that there is no likelihood of confusion because both parties' customers use an extraordinary degree of care in purchasing the respective products. In its marketing materials, LCI sets forth customer testimonials detailing the exhaustive process used by its customers in selecting LCI products. For example, one customer stated:

> Our team conducted a thorough process to select a LMS [learning management system] provider. We put together a lengthy requirements list and compared several companies. Besides meeting our specified requirements, [LCI] was selected on the basis of product flexibility, control of customization, client feedback, and our site visit observations. The [LCI] clients we contacted all described very positive and collaborative relationships with the company. The customer support we have received, from sales to contracting to training, has been very good.

(Brown Decl. – Trademark Claims – Ex. 3 at 32.) Conversely, TLI contends that its own customers are teams of K-12 educators, mostly public, utilizing public funds to purchase a web-delivered technology literacy curriculum for their school districts. Because public funds are involved, the decision to purchase a particular curriculum is carefully scrutinized.

> In every case, the funding for the purchase of [TLI] products by a public school or school district is controlled by a public entity such as a school board made up of elected or appointed officials that govern a school district. . . . Often, we are referred to central office specialists, who convene school-based teams. Those teams review our product and [then make a] recommendation back to the central office which forwards it on to the school board. There are usually at least four separate groups that each must approve the purchase of classroom materials; the curriculum department, the district technology department . . . the business department, and the "economic buyer" who pays for the product out of its budget. Principals and teachers can also have a role in influencing the purchasing decision.

(Karen Talbert Decl. – Trademark Claims – ¶ 4.2, Nov. 13, 2008.) Based on the record in this case, it is clear the purchasers of TLI's and LCI's respective products are sophisticated buyers who make informed decisions. Given the deliberative and exhaustive process followed by each companies' customers prior to purchase, it is very unlikely that the customers involved in buying the respective products would be confused.

Finally, LCI argues that TLI "ignores that the parties both offer low cost versions of some of their products and services to individuals through their websites." (Def.'s Opp'n Mem. – Trademark Claims – 33.) LCI insists that the consumers of lower-priced goods and services are not

Page 44 - Findings and Recommendation                                    [LB]

as sophisticated as those described above. *See M2 Software, Inc.*, 421 F.3d at 1084 (even though majority of M2 Software's products were distributed to sophisticated buyers in the music industry, "copies of the [products] were sold to consumers at large," and therefore "likelihood of confusion of the casual consumer and the 'discerning buyer' must be considered").

TLI has presented evidence that less than .1 percent of its gross revenue for fiscal year 2008 was derived from sales to individuals over its website and over 99.9 percent derived from sales to schools, school districts and other K-12 entities. (Kelly Decl. – Trademark Claims – ¶¶ 5,6.). In addition, the record reveals that the "low cost versions" of LCI's products are offered exclusively under the LEARN2.COM mark at *www.tutorials.com*. (Cook Decl. – Trademark Claims – ¶ 8, Ex. 7.)  As stated above, a customer seeking low cost "how to" tutorial software sold under the LEARN2.COM mark is unlikely to confuse that product with technology used to teach core curriculum to school-aged individuals.  Further, a theoretical possibility, i.e., less than .1 percent, that an individual customer may confuse TLI's and LEARN2.COM's product, is not a sufficient basis for finding confusion to the public.

The court finds that the purchasers of TLI's and LCI's respective products are sophisticated buyers exercising a high degree of care.  Further, the court finds that it is unlikely the buying groups, i.e., corporations, government agencies, school districts, for either parties' goods and services would confuse TLI's K-12 curriculum and assessment tools with LCI's learning management system. *Compare M2 Software, Inc.*, 421 F.3d at 1084 ("M2 Software offers two discrete types of products, each with a distinct group of purchasers.")  Accordingly, because the consumers of the goods and services offered under the parties respective marks exercise a high degree of care, which lessens the likelihood of confusion between the two marks, this factor weighs against finding infringement.

Page 45 - Findings and Recommendation                                              [LB]

          d.     LCI's Intent in Selecting the Mark

When the alleged infringer *knowingly* adopts a mark similar to another's mark, the court will

presume the public will be deceived. *See Sleekcraft*, 599 F.2d at 354 (emphasis added); *see also*

*Brookfield*, 174 F.3d at 1059 (adopting a designation with the intent of deriving a benefit may be

sufficient to create an inference of confusing similarities). "A party claiming infringement need not

demonstrate that the alleged infringer intended to deceive customers." *E. & J. Gallo Winery v. Gallo*

*Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992).

TLI became aware of LCI's use of its mark during a trademark search on April 1, 2000. LCI

was, however, but one of dozens of entities listed to use a mark with the word "learn" or "learning."

(Supp. Brown Decl. Ex. 7, Dec. 29, 2008.) Indeed, in his declaration, Kelly, co-founder and CEO

of TLI stated, in part:

> Dr. Burns and I began to develop a business concept that would become [TLI]. As
> we worked on funding the venture and creating a revenue model, we also searched
> for a name for our business. In doing so, we discovered that the domain name
> registration for "learning.com" was for sale. Ultimately, we agreed to pay $300,000
> for the registration, which was an extraordinary expenditure for our new venture.
> Before making that commitment, our staff, with the assistance of counsel, carefully
> investigated potential problems that could arise from using [LEARNING.COM] as
> a trademark. That investigation included visits to websites of the other entities.
> Among the hundreds of entities doing business under a mark including the word
> Learn or Learning of which we became aware of was [LCI], doing business under the
> name LEARN.COM. After reviewing their website, those charged with our
> investigation concluded that [LCI] was in a very different business than we were
> developing and that there would be no problem peacefully coexisting given the
> differences in the businesses and the names themselves.

(Kelly Decl. ¶ 16.) TLI investigated LCI's use of the mark and concluded it was unlikely there

would be a problem because the parties' businesses were obviously unrelated.

LCI argues that TLI's prior knowledge of LCI's nearly identical mark on closely related services is sufficient to preclude summary judgment. *See, e.g., Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1109, 1111 (9th Cir. 2002) ("Adopting a designation with knowledge of its trademark status permits a presumption of intent to deceive . . . . In turn, intent to deceive is strong evidence of a likelihood of confusion."). *But see Kendall-Jackson Winery, Ltd. v. E.&.J. Gallo Winery*, 150 F.3d 1042, 1052 n.11 (9th Cir. 1998) (while proof of intent to cause confusion "is entitled to great weight," it does not create "a presumption of confusion that shifts the burden of proof to the other party").

Conversely, TLI argues the intent factor is not satisfied simply because a later-in-time user knew of a prior use of the mark before adopting it. *See, e.g., M2 Software*, 421 F.3d at 1085. In *M2 Software*, the court upheld the district court's conclusion that the alleged infringer did not have the requisite intent for two reasons. First, even though the alleged infringer became "aware of M2 Software's M2 mark" during a trademark search, the alleged infringer believed it could "carve out" a non-infringing mark. 421 F.3d at 1085. Second, the size, experience, and production capacity of the alleged infringer relative to M2 Software ruled out the possibility that a reasonable trier of fact could conclude that the alleged infringer "had any intention of capitalizing on M2 Software's trademark." *Id.*

Similarly, TLI has submitted evidence that it moved forward in adopting the mark only after concluding that the companies were developing very different businesses, the company names were different, and they companies could coexist given those enumerated differences. Additionally, LCI does not contend that TLI intended to capitalize on the popularity or market recognition of the LCI trademark. Consistent with the Ninth Circuit's decision in *M2 Software, Inc.*, this factor weighs

Page 47 - Findings and Recommendation                                    [LB]

against a finding of infringement. *Compare Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157 (9th Cir. 1963) ("[W]hen the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.")

         e.      Likelihood of Expansion of Product Lines.

This factor addresses the concern for confusion in the event one or both parties expand their goods and services and create an overlap. *See Interstellar*, 184 F.3d at 1111; *Sleekcraft*, 599 F.2d at 354 ("Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing."). When goods are "closely related," expansion of the goods is more likely to "result in direct competition." *Sleekcraft*, 599 F.2d at 354. Additionally, there must be "a *strong possibility* of expansion into competing markets" for this factor to weigh "in favor of a finding of infringement." *E. & J. Gallo Winery*, 967 F.2d at 1293 (emphasis added). For example, in *M2 Software, Inc.*, the Ninth Circuit held that there was not a "strong possibility" of expansion into competing markets when M2 Software "broadened marketing of its 'interactive content' on the [I]nternet . . . ." 421 F.3d at 1085. M2 Software sold only a *de minimus* amount of audio CDs over a ten-year period, and thus it "was doubtful that M2 Software would expand into general retail distribution of audio CDs." *Id.*

TLI contends that "[n]othing suggests that the existence of the TLI's mark is hindering [LCI's] expansion plans" because LCI has not produced, and does not plan to produce, "curriculum

Page 48 - Findings and Recommendation            [LB]

approved by state oversight boards," nor does LCI have the expertise to sell into the K-12 education market. (Pl.'s Mem. Supp. Summ. J. – Trademark Claims – 27-28.) TLI emphasizes that LCI's sale of goods and services to only nine K-12 entities between 2000 and 2008 does not establish LCI's place in the K-12 content market. TLI insists that there is not a strong enough possibility of expansion into competing markets to weigh in favor of finding infringement.

Conversely, LCI contends that the parties' services are related and do overlap because both are in the K-12 market. Additionally, LCI argues that TLI's trademark application indicates a broader category of online delivery of educational content. LCI points out that TLI filed a second trademark application declaring an intent to use its mark for a range of online computer services that are limited neither to curriculum content nor the K-12 market. As such, LCI maintains that TLI is likely to expand into a competitive market with LCI that will result in an even greater overlap of the parties' goods and services.

The record reveals that TLI's expansion intentions relate solely to providing additional curriculum for grades 6-12. For example, in his deposition, Kelly stated:

> Q.    And then on page 7 of this document, top right-hand corner there's, fiscal year '08 strategic initiatives?
>
> A.    Yes.
>
> Q.    And the bottom bullet is, partner for additional content.
>
> A.    Yes.
>
> Q.    Can you tell me what that refers to?
>
> A.    We are beginning to create partnerships with owners of content that can be distributed via [*learning.com*]. And we are developing business relationships in which, for revenue share we will host, deliver, support, and in some cases market and sell the product of a third-party content provider.

Page 49 - Findings and Recommendation                                    [LB]

Q.    Has Learning.com actually launched a product that meets this criteria being partner, a partner for additional content?

A.    No.

Q.    Has it signed any deals with any partners?

A.    We have signed a letter of intent but not a definitive agreement.

Q.    In general, what's the subject matter of the content?

A.    The first deal that, we're working on probably a dozen and a half deals. So there's a wide range of content specific to K-12 instruction that is being considered. The first deal is one that has to do with middle school math and science content.

Q.    Is that the one for which there's a letter of intent?

A.    Yes.

. . . .

Q.    Do you know what grades this partnership, the product of this partnership is going to be focused on?

A.    Grades 6 through 12.

. . . .

Q.    Is that one of the things that's been discussed?

A.    What?

Q.    In this partnership, teaching kids or, I'm sorry, teaching people in grades 6 through 12 how to become proficient in certain types of software?

A.    That has not been discussed.

Q.    Besides the one that we've just been talking about, about digital video computer skills and programming skills, are there any other potential

> partnerships that Learning.com is discussing right now that involve teaching
> computer skills to K-to-12 students?

A.    No.

(Kelly Dep. 106:14-107:18, 109:10-13, 109:22-110:10, Feb. 6, 2008.)

Conversely, LCI's submissions disclose that its involvement in the K-12 market place is minimal. While LCI maintains that its content based on adult learning theory maybe be appropriate for use with some students, there is no evidence in that record that an older student, of high school age, has ever used content sold under the LEARN.COM mark. Further, K-12 entities represent no more that four percent of LCI's customer base, and LCI has sold content materials to an average of only one customer per year between 2000 and 2008. *See M2 Software, Inc.*, 421 F.3d at 1085 (*de minimus* overlap of the parties' respective markets is insufficient to create a "strong possibility" of the parties' expanding into competing markets).

Based on the record, there is not presently a "strong possibility" that either party will expand its business to compete with the other. Although the court is unable to conclude as a matter of law that the parties' goods and services are unrelated, the evidence establishes that, almost exclusively, the parties offer dissimilar products to different customers and neither party's intended use of their products suggests an expansion into the other's territory. Simply put, even the most generous accounting shows that, in over 95% of sales, the parties offer distinctly different goods and services to distinctly different customers. Further, there is no evidence in the record of TLI's plans to expand into LCI's territory. Accordingly, this factor weighs against a finding of infringement.

To prevail on its trademark infringement claims, which turn on the likelihood of confusion, LCI must present "sufficient evidence to permit a rational trier of fact to find that confusion is

'probable,' not merely 'possible.'" *M2 Software, Inc.*, 421 F.3d at 1085. As explained above, LCI

has failed to establish that there is a triable issue of fact regarding six of the eight *Sleekcraft* factors.

Specifically, the court has found as a matter of law that the factors of similarity of the marks,

marketing channels, evidence of actual confusion, type of goods and degree of care, intent, and

expansion of product lines weigh against a finding of infringement. Further, with respect to one of

the two *Sleekcraft* factors that do not obviously weigh in favor of no likelihood of confusion,

strength of the mark, the court has determined only that there were questions of facts, as opposed to

a finding in LCI's favor. Finally, with respect to the relatedness of goods and services factor, the

court has determined that this factor weighed only slightly in favor of finding infringement.

In sum, "the ultimate question posed by the *Sleekcraft* analysis [is] the likelihood of

confusion as to the source of the product." *M2 Software*, 421 F.3d at 1081. Considering the

*Sleekcraft* factors as a whole, LCI has failed to raise a triable issue regarding the likelihood of

confusion between the parties' marks. *See Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d

at 634 (no material issue of fact regarding likelihood of confusion despite three factors weighing in

favor of infringement); *Cf. Interstellar*, 184 F.3d at 1110 (reversing the grant of summary judgment

because five of the *Sleekcraft* factors required the weighing of conflicting evidence); *Dreamwerks*

*Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130-32 (9th Cir. 1998) (summary judgment

inappropriate where plaintiff satisfied three *Sleekcraft* factors and the other factors carried "little

weight"). *See also Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1076

(9th Cir. 2006) ("In the final analysis, [court] must consider the *Sleekcraft* factors as a whole to

determine whether a likelihood of confusion results from [an alleged infringer's] use of the marks.").

On this basis, TLI is entitled to a finding on summary judgment that there is no likelihood of

confusion between its use of the LEARNING.COM mark and that of LCI's LEARN.COM or LEARN2.COM.

B.      Trademark Infringement Under Oregon Law – Counterclaim II

In its Counterclaim II, LCI alleges that TLI's registration of its mark LEARNING.COM constituted infringement of LCI's trademark rights in violation of OR. REV. STAT. § 647.095, and Oregon common law. To establish trademark infringement under Oregon law, LCI must show that TLI's mark "created a likelihood of confusion." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir. 1983). The Ninth Circuit explains: "The gravamen of both an infringement and an unfair competition claim is whether the defendant has created a 'likelihood of confusion.'" *Id.* (citing 15 U.S.C. § 1125(a) (1976); OR. REV. STAT. § 646.608(1)(b)); *see also Newport Pac. Corp. v. Moe's Sw. Grill, LLC*, No. 05-995-KI, 2006 WL 2811905, at *11 (D. Or. Sept. 28, 2006) ("Plaintiff's federal and state statutory claims for trademark infringement and unfair competition, as well as their related common law claims, all require proof that there is a likelihood of confusion"). Because the court has determined as a matter of law that TLI's mark does not create a likelihood of confusion, judgment should be entered against LCI's Counterclaim II for Oregon statutory and common law trademark infringement.

C.      Unfair Competition – Counterclaim III

In its Counterclaim III, LCI alleges that TLI's registration of its mark LEARNING.COM constituted unfair competition under Oregon common law and section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1). To establish federal unfair competition, LCI must show that TLI's mark "created a likelihood of confusion." *Shakey's Inc.*, 704 F.2d at 431. Because the court has determined as a matter of law that TLI's mark does not create a likelihood of confusion, judgment

should be entered against LCI's Counterclaim III for unfair competition pursuant to state and federal law.

        D.      Unlawful Business Practice – Counterclaim IV

      In its Counterclaim IV, LCI alleges that TLI's registration of its mark LEARNING.COM constituted unlawful business practices in violation of OR. REV. STAT. § 646.608. To establish unfair business and trade practices under Oregon law, LCI must show that TLI's mark "created a likelihood of confusion." *Shakey's Inc.*, 704 F.2d at 431. The Ninth Circuit, citing OR. REV. STAT. § 646.608(1)(b), stated that: "The gravamen of both an infringement and an unfair competition claim is whether the defendant has created a 'likelihood of confusion.'" *Id.* Because the court has determined as a matter of law that TLI's mark does not create a likelihood of confusion, judgment should be entered against LCI's Counterclaim IV for unlawful business and trade practices under Oregon law.

        E.      Attorney's Fees - 15 U.S.C. § 1117(a) – Counterclaim VI

      It its Counterclaim VI, LCI seeks reasonable attorney's fees as the prevailing party in this action against TLI. A court may grant the prevailing party attorney's fees under the Lanham Act in "exceptional cases." The Lanham Act provides, in part, that:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action . . . . The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a) (2008).

      A trademark case is exceptional and merits an award of attorney's fees "where the infringement is malicious, fraudulent, deliberate or wilful." *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d

1378, 1384 (9th Cir. 1984) (citing *Playboy Enters. v. Baccarate Clothing Co. Inc.,* 692 F.2d 1272,

1276 (9th Cir. 1982)). LCI alleges that TLI's fraudulent conduct before the PTO renders this case

exceptional and entitles it to attorney fees as the prevailing party. As discussed in Section I.B. above,

TLI did not commit fraud on the PTO as a matter of law. LCI also alleges it is entitled to attorney's

fees because TLI has pursued groundless and unreasonable claims and has acted in bad faith. As

discussed in Section II.A. above, TLI did not infringe on LCI's marks as a matter of law. LCI is not

entitled to attorney's fees under section 1117(a), and judgment should be entered against LCI's

Counterclaim VI.

III.    Merely Descriptive

LCI filed a motion for partial summary judgment seeking a determination that its federally

registered trademarks LEARN.COM and LEARN2.COM are not "merely descriptive." LCI argues

as a matter of law that its marks are broad terms that make only a vague, indirect reference to learning

or education, and are not merely descriptive. According to LCI, there can be no  factual dispute on

this issue given TLI's declarations to the PTO that its LEARNING.COM mark was not merely

descriptive. Indeed, LCI insists that judicial estoppel now bars TLI from making an inconsistent

statement in this litigation. TLI filed a cross-motion for partial summary judgment arguing that LCI's

marks were merely descriptive of  LCI's goods and services both when TLI first used its

LEARNING.COM mark, and when LCI's federal registrations for the LEARN.COM and

LEARN2.COM marks issued.

As a threshold matter LCI contends that TLI's cross-motion should be denied as untimely for

several enumerated reasons. The court will allow TLI's cross-motion because the motion does not

raise novel issues and there is no showing of prejudice to LCI. LCI also moves to strike TLI's

Page 55 - Findings and Recommendation                                                          [LB]

response to LCI's statement of facts on the ground it exceeds the five page limit allowed by LR 56.1(d). LCI does not allege undue prejudice or burdensomeness as a result of the over length fact statement. Accordingly, the court will allow TLI's concise statement of facts.

A.    Merely Descriptive

To establish trademark infringement, LCI "must demonstrate that it owns a valid mark, and thus a protectable interest." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). In order for a mark to be registered, it "must be capable of distinguishing the applicant's goods from those of others." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. at 768 (citing 15 U.S.C. § 1052). Marks are divided into five categories: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* Only suggestive, arbitrary, and fanciful marks are "deemed inherently distinctive and are entitled to protection" because "their intrinsic nature serves to identify a particular source of a product . . . ." *Id.* Thus, the determination that a mark is descriptive essentially denies its registration because "marks which are merely descriptive of a product are not inherently distinctive."[10] *Id.* at 769.

Nevertheless, under section 2 of the Lanham Act, a descriptive mark may be registered if "it 'has become distinctive of the applicant's goods in commerce.'" *Id.* (quoting 15 U.S.C. § 1052(e), (f)). This acquired distinctiveness is referred to as "secondary meaning." *Id.* Thus, the owner of a descriptive mark must make a showing of secondary meaning to register its mark. *See Sleekcraft*, 599 F.2d at 349 ("A descriptive mark . . . will be protected only when secondary meaning is shown."). The crucial date for determining whether a mark has secondary meaning through acquired distinctiveness "is the date on which the alleged infringer entered the market with the disputed mark

---

[10] Neither party contends that its respective marks are arbitrary or fanciful.

or term." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005). In other words, the owner of the mark is "required to prove that [the mark] had acquired secondary meaning" before the alleged infringer "began using [its own mark.]" *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985).

LCI cannot prevail on its trademark claim unless its marks are distinctive, rather than merely descriptive. *See Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998) ("To recover for the infringement of a trademark . . . [plaintiff] had to prove that . . . the design is inherently distinctive or acquired distinctiveness through a secondary meaning . . . ."). A merely descriptive trademark "describes the qualities or characteristics of a good or service . . . ." *Park N' Fly,* 469 U.S. at 194. By contrast, a suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand that mark's significance . . . ." *Entrepreneur*, 279 F.3d at 1141 (internal quotations and citation omitted). Trademarks are descriptive if they "naturally and normally direct attention to the qualities, ingredients, appearance, effect, purpose, or other features of goods or services . . . ." *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*, 448 F.2d 1293, 1295 (9th Cir. 1971) (internal quotations and citation omitted). Merely descriptive marks are referred to as "generic" marks. *Park N' Fly, Inc.*, 469 U.S. at 194. Descriptive marks are "generic" because when used to describe a product, they do not "inherently identify a particular source, and hence cannot be protected." *Two Pesos, Inc.*, 505 U.S. at 769.

The Ninth Circuit recently stated that the relevant inquiry used to determine if a mark is descriptive is "'whether, when the mark is seen on the goods or services, it immediately conveys information about their nature.'" *Lahoti v. Vericheck*, ___ F.3d ___, 2009 WL 3807105, *8 (9th Cir. Nov. 16, 2009)(quoting *In re Patent & Trademark Servs. Inc.*, 49 U.S.P.Q.2d 1537, 1539 (T.T.A.B.

1998). The court in *Lahoti* explained that the context of the marks is critical to the distinctiveness analysis. 2009 WL 3807105, at *7. Specifically, a determination of suggestive or descriptive can be made only by reference to the goods or services that it identifies. *Id.* (citations omitted).

LCI argues that its marks are not descriptive because they "do not provide *any* knowledge of the characteristics of LCI's specific goods or services." (Def.'s Mem. Supp. Summ. J. – Merely Descriptive – 12.) Specifically, LCI contends that:

> [T]he most that could be said is that LEARN.COM and LEARN2.COM are broad terms that make an indirect and vague reference to the general process of gaining knowledge (learning). . . . But the marks do not indicate any characteristics of that process with respect to [LCI's] products, such as by whom, of what, where, when, or how any knowledge is gained.

(Def.'s Mem. in Supp. – Merely Descriptive – 13.)

TLI responds to these arguments in three parts, based on chronology. First, TLI responds that the LEARN.COM mark was descriptive at the first-use date of TLI's mark, May 15, 2000. The timing is important because the crucial date for determining whether a mark has secondary meaning through acquired distinctiveness "is the date on which the alleged infringer entered the market with the disputed mark or term." *Yellow Cab Co.*, 419 F.3d at 928. TLI argues that at the first-use date of its mark "the relevant purchasing public . . . would recognize that the [LEARN.COM mark] conveyed knowledge of a quality, effect, purpose or other features of [LCI's] goods and services" and "[LCI's] website and marketing materials advanced consumer perception that LEARN.COM was descriptive of [LCI's] goods and services." (Pl.'s Opp'n Mem. – Merely Descriptive – 13-14.) To supports its argument, TLI offered evidence that LCI regularly used the term 'learn' to describe its courses; for example, in titles like "Learn Murphy's Law" and "Learn how to protect yourself when you buy a used car."

Page 58 - Findings and Recommendation                                    [LB]

Next, TLI claims that the LEARN2.COM mark was also descriptive of LCI's goods and services at the time of the first-use date of LEARNING.COM. In fact, TLI insists that a "purchaser of Panmedia's course offerings would not have needed to use his or her imagination to understand ... that the LEARN2.COM mark directly conveyed knowledge about Panmedia's 'How to' guide and adult training products and services." (Pl.'s Opp'n Mem. – Merely Descriptive – 15.) TLI supports this argument by noting that Panmedia's course offerings carried descriptive titles using the LEARN2.COM mark to convey their content.

Finally, TLI contends that both of LCI's marks were descriptive of its goods and services at the time they were registered in the Spring and Summer of 2003. This timing is important because the "registrability of a mark must be determined on the basis of facts as they exist at the time when the issue of registrability is under consideration," which "extends at least to the time the application is acted on in the Patent Office." *Application of Thunderbird Prods. Corp.*, 406 F.2d 1389, 1392 (C.C.P.A. 1969); *see also Harsco Corp. v. Elec. Scis. Inc.*, 9 U.S.P.Q.2d (BNA) 1570, 1571-72 (T.T.A.B. 1988) ("the critical date is the date of registration, because if a mark which is not registrable in the absence of proof of distinctiveness was not in fact distinctive at the time of the issuance of a registration thereof, then the registration was invalidly issued"). Thus, TLI argues that registration for a mark that is merely descriptive at the time of registration, and lacks secondary meaning, is subject to cancellation. To support this third argument, TLI points out that by November 2002, LCI added description and keyword metatags to the *learn2.com* website to emphasize the "availability of tutorials that 'enable you to learn software and business skills without downloads or delays,' 'Learn software such as Microsoft Office, Pocket PC, Palm, and Windows XP,'" and "learn

in the comfort of your own home, at your own pace.'" (Pl.'s Opp'n Mem. – Merely Descriptive – 17 (and citations therein).)

In their respective pleadings each party insists that the court must find as a matter of law that LCI's marks are or are not descriptive. The court notes, however, that generally "[w]hether a term is a common descriptive name is a question of fact." *In re Northland Aluminum Products, Inc.*, 777 F.2d 1556, 1559 (Fed. Cir.1985); *see also Yellow Cab Co.*, 419 F.3d at 929-30 (reverse grant of summary judgment; triable issues of fact existed as to whether mark was generic or descriptive); *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173 (Fed. Cir. 2004) (determining a mark's placement on the fanciful-suggestive-descriptive-generic continuum is a question of fact); *In re Nett Designs, Inc.*, 236 F.3d 1339, 1341 (Fed. Cir. 2001) (same).

The Federal Circuit has explained that "[i]nherent distinctiveness or descriptiveness involves consumer perception and whether consumers are predisposed towards equating a symbol with a source." *In re Slokevage*, 441 F.3d 957, 960 (Fed. Cir. 2006) (citations omitted). *See In re MBNA America Bank, N.A.*, 340 F.3d 1328, 1332 (Fed. Cir. 2003); *In re Nett Designs, Inc.*, 236 F.3d at 1341-42; *see also* 2 *McCarthy* § 11.3 (noting that the "vast majority" of courts consider distinctiveness a question of fact).

On the spectrum of trademark protection, TLI places LEARN.COM and LEARN2.COM at the descriptive end, and LCI places it at the worst, suggestive. TLI urges the court to find the mark descriptive because LCI used the term "learn" to describe its courses, and Panmedia's course offerings used the LEARN2 mark in its titles. Conversely, LCI insists that its marks are at least suggestive because much more information would be needed to convey information about the nature of its products. Despite the parties' respective arguments, the court is unable to conclude with

certainty that the marks LEARN.COM or LEARN2.COM do or do not "immediately convey information about [the] nature" of LCI's goods and services offered. *Lahoti*, 2009 WL 3807105, at *8. Rather, the issue of whether LCI's marks are descriptive or suggestive is a question of fact and not appropriate for resolution at summary judgment.

Further TLI is unable to adequately explain why the asserted classification of suggestive for its own mark, LEARNING.COM, should not be considered by the court in determining whether LCI's marks are distinctive. TLI simply argues that its mark (LEARNING.COM) is different from LCI's marks (LEARN.COM and LEARN2.COM ) and that the parties' respective goods and services are also different. Accordingly, TLI maintains the court should focus solely on whether LCI's marks are descriptive. This position is contrary to Ninth Circuit law for purposes of determining descriptive versus distinctive. *See Lahoti*, 2009 WL 3807105, at *6 (when determining distinctiveness "courts may also defer to the PTO's registration of highly similar marks" (citing *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 119-20 (1st Cir. 2006) ("the PTO's acceptance of these other marks [containing 'rica'] for registration supports the idea that 'rica' can be an inherently distinctive term"))). While the court determined in Section II.A.1.a., above, that the marks are neither visually or aurally similar, it was unable to find as a matter of law that the meaning of "learning" and "learn" was not similar. Thus, for purposes of analyzing whether a mark is distinctive or descriptive, the fact that the PTO issued a Notice of Publication for the LEARNING.COM mark could create a presumption that the term "learn" is distinctive. *See Lahoti*, 2009 WL 3807105, at *6. In addition, the court cannot conclude as a matter of law that the parties' products are not similar. *See id.* (citing *U.S.Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) ("principle that a mark is suggestive because PTO found a 'nearly identical' mark to be suggestive 'seems to make some

intuitive sense' when the marks describe similar services")).  The court finds that neither party has met its burden to show that LCI does or does not hold a distinctive mark as a matter of law and, thus, the issue remains one for trial.

Next, TLI opposes LCI's summary judgment motion on the grounds that LCI did not reserve the right to assert acquired distinctiveness when it amended its registration to the PTO in November 2000, and its failure to do so is persuasive evidence of the descriptiveness of the LEARN.COM mark. "Generally, a claim of Section 2(f) [that the mark has acquired distinctiveness] is tantamount to a concession of a mark's [inherent] non-distinctiveness." *Gen. Foods Corp. v. Mgd Partners*, 224 U.S.P.Q. (BNA) 479, 485 (T.T.A.B. 1984). But an applicant making a claim under Section 2(f) does not make the concession of inherent non-distinctiveness if "it [is] clear that an applicant had reserved its contentions as to inherent distinctiveness while converting to a Section 2(f) request . . . ." *Id.*; *see also* TMEP § 1212.02(c) (when a claim of acquired distinctiveness is made in the alternative or after objecting to the examiner's refusal, the claim "does not constitute a concession that the matter sought to be registered is not inherently distinctive").

LCI insists that it reserved that right when it disagreed with the PTO's decision and stated that its LEARN.COM mark "is not solely descriptive whereas it cannot identify the products as sold, and is clearly distinguishable from other goods." (Klein Decl. – Mot. Dismiss – Ex. 1 at 16, Ex. 2 at 18, Nov. 27, 2007.)  According to LCI, the written record on this issue is undisputed and cannot create a factual dispute.  Moreover, LCI insists that TLI's arguments that LCI conceded inherent distinctiveness to the PTO has twice been reject by the court in this case and law of the case doctrine bars it from doing so here. *See The Learning Internet*, CV 07-227-AC, 2008 WL 2037282, at *3-4

(LCI "is not statutorily barred from asserting inherent distinctiveness in its pleading, despite its application and registration under Subsection(f).").

The court first considers whether the law of the case doctrine bars TLI from arguing now that LCI waived its right to assert the inherent distinctiveness of its marks. Under the law of the case doctrine, a court is ordinarily barred from reexamining an issue previously decided by the same court, or a higher court, in the same case provided the issue in question was decided explicitly or by necessary implication in the previous disposition. *Hydrick v. Hunter*, 500 F.3d 978, 986 (9th Cir. 2007), *vacated on other grounds*, ___ U.S. ___, 129 S.Ct. 2431 (2009). There are, however, some exceptions to this doctrine. Specifically, a court's decision to apply the doctrine will be deemed an abuse of discretion if "(1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *United States v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir. 2000).

Whether the law of the case doctrine applies turns on whether Judge Ashmanskas's[11] statement that LCI's actions before the PTO "amount to, at most, an objection to the examiner's finding of non-descriptiveness and, at least, an assertion of the Subsection (f) application in the alternative" is dicta. *See The Learning Internet*, CV 07-227-AC, 2008 WL 2037282, at *4. Dicta is a statement "made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." BLACK'S LAW DICTIONARY (8th ed. 2004). It is "often difficult to determine whether statements in a court's opinion constitute an alternative

---

[11]Judge Ashmanskas previously presided over this case, which was transferred to the undersigned in March 2008.

ground for the decision or merely dicta." *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1471 n.4 (9th Cir. 1995).

TLI argues that the statement is dicta and therefore cannot constitute law of the case because it was made *after* Judge Ashmanskas' determination that where a subsection (7) registration is asserted "together with an objection to the examiner's finding of no inherent distinctiveness, it does not act as a bar to a later assertion that the mark is not merely descriptive." *The Learning Internet*, CV 07-227-AC, 2008 WL 2037282, at \*4. Accordingly, TLI concludes that the statement's placement renders it unnecessary to the decision in the case.

This argument is unavailing for two reasons. First, TLI cites no legal support for its conclusion that a statement's placement in an opinion determines its importance. Second, the statement actually occurs *before* the court's *conclusion* that "this court finds that Defendant is not statutorily barred from asserting inherent distinctiveness in its pleading." *Id.* at \*4. Thus, following TLI's reasoning, the statement would not be dicta because it was placed before the holding.

This court had an adequate opportunity to rule, and actually did rule, on whether LCI was barred from asserting inherent distinctiveness, making it the "law of the case" and not subject to reopening, absent certain exceptions. *See Agostini v. Felton,* 521 U.S. 203, 236 (1997) ("Under [the law of the case] doctrine, a court should not reopen issues decided in earlier stages of the same litigation."). TLI does not assert any such exception here. Accordingly, LCI may assert its inherent distinctiveness argument here.

Moreover, the court notes that while generally a Section 2(f) claim can be construed as a concession of the mark's non-distinctiveness, this court previously recognized the circuit split "as to whether failure to object to a finding of non-distinctiveness coupled with an application for

Page 64 - Findings and Recommendation                                    [LB]

registration under Subsection (f) is tantamount to an admission . . . that the mark is not inherently

distinctive." *The Learning Internet*, CV 07-227-AC, 2008 WL 2037282, at *4. Thus, the principle

proffered by TLI does not require a finding that in *every* case an applicant amending its registration

pursuant to Section 2(f) *must* indicate that the amendment is made in the alternative or without

prejudice. Rather, it is clear from a review of the cases that  courts considering a Section 2(f) claim

as a bar to asserting inherent distinctiveness  frequently reach the merits of such a dispute. *See, e.g.,*

*Gen. Foods Corp.*, 224 U.S.P.Q. at 485 ("on occasion [the Board has] dealt with that issue on the

merits where . . . the grant of registration under Section 2(f) may have been inadvertent or not clear

to the parties"); *General Foods Corp. v. Ralston Purina Co.*, 220 U.S.P.Q. 990, 992 (T.T.A.B. 1984)

(allowing a determination on the merits despite applicant amending application to include a section

2(f) claim without reservation); *Congoleum Corp. v. Armstrong Cord Co.*, 218 U.S.P.Q. 528, 535

(T.T.A.B. 1983) ("[W]hereas generally a claim of Section 2(f) is tantamount to a concession of a

mark's non-distinctiveness, we do not apply the rule in this case."). In this case, LCI asserted in its

November 2000 letters to the PTO that its mark "is not solely descriptive whereas it cannot identify

the products as sold, and is clearly distinguishable from other goods." (Klein Decl. – Mot. Dismiss

– Ex. 1 at 16, Ex. 2 at 18.) As such, the court will preserve for the trier of fact a decision on the

merits of whether LCI marks are or are not distinctive.

In sum, the court finds that material questions of fact must be resolved prior to a determination

that LCI's marks are or are not descriptive. Additionally, the law of the case doctrine bars TLI from

again asserting that LCI conceded the issue of non-distinctiveness before the PTO. Alternatively, the

court will exercise its discretion to allow LCI to pursue a decision on the merits

regarding the distinctiveness of its marks based on its assertions in the November 2000 letters to the PTO.

      B.     Representations to the PTO

      Finally, LCI contends that TLI represented to the PTO that its LEARNING.COM mark was not descriptive. As such, LCI concludes that "having made the clear-cut factual assertions" that LEARNING.COM was not descriptive, TLI cannot now ignore those representations and attempt to create a factual dispute. (Def's. Mem. Supp. Summ. J. – Merely Descriptive – 15.) In fact, LCI argues that TLI is judicially estopped from now asserting that LCI's marks are merely descriptive. TLI responds that its representation to the PTO that the LEARNING.COM mark was not descriptive involved facts different from those in the present litigation, and its representations to the PTO were legal arguments, not facts.[12]

      Judicial estoppel is an "equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). The doctrine applies "when a party's position is tantamount to a knowing misrepresentation to or even fraud on the court." *Johnson v. State of Or.*, 141 F.3d 1361, 1369 (9th Cir. 1998) (internal quotations and citation omitted). The factors for judicial estoppel are: (1) a party's later position is "clearly inconsistent" with its earlier position, (2) the "party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled," and (3) "the party

---

      [12]The court concluded in Section I.B.1., above, that TLI's representations to the PTO were legal arguments.

seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). Importantly, "many cases have applied [judicial estoppel] where the prior statement was made in an administrative proceeding." *Risetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996) (citing cases involving judicial estoppel and workers' compensation, social security, insurance approval, ICC, and SSA proceedings).

Turning to the first element, LCI argues that TLI representation to the PTO that its mark LEARNING.COM was not descriptive is "clearly inconsistent" with TLI's position here that LCI's mark *are* descriptive. LCI argues once again that the parties' marks are "effectively identical . . . [because they] utilize the same root word" and "relate to the *same* types of online educational products and services that TLI addressed in its PTO application." (Def.'s Mem. Supp. Summ. J. – Merely Descriptive – 17 (emphasis in original).)

TLI responds that its arguments "before the PTO in support of its trademark application and the allegations in its complaint in this matter concern *different* marks used in connection with *different* goods and services," and thus its two positions are in response to a different set of facts. (Pl.'s Opp'n Mem. – Merely Descriptive – 23 (emphasis in original).) TLI argues that the relevance of different facts is important because "the inquiry whether a particular mark is merely descriptive of a particular set of goods or services is highly subjective and fact specific." (Pl.'s Opp'n Mem. – Merely Descriptive – 23.) Indeed, the "great variation in facts from case to case prevents the formulation of specific rules for specific fact situations," and thus each "case must be decided on its own merits." TMEP § 1209.01(b) (citing *Ampco Foods*, 227 U.S.P.Q. 331; *Venturi*, 197 U.S.P.Q.

714).   Accordingly, TLI explains that its positions are not inconsistent because the factual circumstances are different and LCI has failed to cite a case finding such positions inconsistent.

In Section II.A.1.b. above, the court determined that there are factual disputes regarding the level of similarity between the goods and services associated with the parties' marks. This conclusion is applicable here because the level of similarity between the parties' goods and services would affect the determination of whether TLI's positions are "inconsistent." Because there are questions of fact that must be resolved first, LCI cannot show as a matter of law that TLI's position in this litigation is inconsistent with its representations to the PTO.

Turning to the second factor, LCI argues that TLI did successfully advance its earlier position because its statements to the PTO that its mark was not descriptive caused the examining attorney to withdraw the rejections and allow both applications to proceed toward registration. LCI adds that the PTO's issuance of a Notice of Publication, "indicating that the marks would be published in the PTO's Official Gazette for public notice and comment before being issued formally as trademark registrations," is sufficient to show TLI's successful advancement of its earlier position.  (Def.'s Mem. Supp. Summ. J. – Merely Descriptive – 19.)

Conversely, TLI argues that the PTO has yet to register the marks that are the subject of its applications. TLI also points out that LCI has opposed both applications before the TTAB and those proceedings have been suspended pending a final determination here. Based on these undisputed facts, the court finds LCI has failed to show as a matter of law that TLI successfully advanced its earlier position.

Turning to the final factor, LCI argues that TLI would enjoy an unfair advantage by overcoming the PTO's rejections and moving its own applications toward registration, while

Page 68 - Findings and Recommendation                                    [LB]

imposing an unfair detriment on LCI by holding it to an entirely different standard and avoid a finding of infringement. In response, TLI contends that if the court were to find that LCI's marks are descriptive, LCI would simply be required to show that its mark acquired secondary meaning prior to TLI's first use of its LEARNING.COM mark. TLI acknowledges that if LCI is able to make such a showing, LCI establishes priority of its use and is permitted to assert its infringement claims. Thus, LCI is unable to show as a matter of law that TLI would derive an unfair advantage and impose and unfair detriment.

The court finds genuine issue of material facts regarding each element of judicial estoppel. As such, judicial estoppel does not bar TLI from arguing on summary judgment that LCI's marks are merely descriptive.

*Conclusion*

For the foregoing reasons, TLI's Motion for Partial Summary Judgment on Fraud Claims and Counterclaims (doc. #66) should be GRANTED, in part, and DENIED, in part. Specifically, TLI's request for judgment against LCI's Counterclaim V should be granted; and, TLI's request for judgment against LCI on Count 1 of TLI's Second Claim for Relief should be denied. TLI's Motion for Partial Summary Judgment on Trademark Infringement Related Claims (doc. #77) should be GRANTED. Specifically, TLI's request for judgment against LCI on Count 1 of TLI's First Claim for Relief should be granted; and TLI's request for judgment against LCI's Counterclaims I, II, III, IV and VI should be granted. TLI's Cross-Motion for Partial Summary Judgment that LCI's Marks are Descriptive (doc. #100) should be DENIED; and LCI's Motion for Summary Judgment that LCI's Marks are not Merely Descriptive (doc. #74) should be DENIED.

*SCHEDULING ORDER*

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due December 11, 2009. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 25th day of November 2009.

John V. Acosta
United States Magistrate Judge